UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| COUNTRY CLUB ASSOCIATES, | : | |
| ET AL., | : | |
|     Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 06-cv-0491 (JCH) |
| v. | : | |
| | : | |
| SHAW'S SUPERMARKETS, INC., | : | |
| ET AL., | : | MAY 29, 2009 |
|     Defendants. | : | |

**AMENDED[1] BENCH TRIAL RULING[2]**

---

[1]This Ruling is amended in two respects. First, the original Ruling misquoted section 6.4 of the Shaw's Lease at page 52; the correct language is quoted here. Second, Stop & Shop paid an administrative fee of 10% on its CAM charges, while Shaw's paid an administrative fee of 15% of its CAM charges. While the court's original Ruling took note of this fact at footnote 11, it did not appropriately account for it in its calculation of damages, and thereby overstated the "excess" amount by which CCA was over-reimbursed by an amount equivalent to one-half of 5% of the CAM charges (pre-administrative fee) billed to Shaw's. Therefore, the court has adjusted the damages due to Shaw's on its counterclaim by an amount equal to one-half of 5% of the CAM charges (pre-administrative fee) that it paid, and has further adjusted the amount of punitive damages and prejudgment interest accordingly. Finally, the court has adjusted the prejudgment interest amounts to calculate those amounts through today, the day the court's amended judgment will issue.

[2]Pursuant to the parties' stipulation, the court deems admitted all exhibits marked "full." In addition, in the absence of objections, it considers those exhibits referred to in testimony and called to the court's attention by counsel for plaintiffs (as incorporated into the marked plaintiffs' exhibit list), and those referred to in testimony and called to the court's attention by counsel for the defendants (as referenced in Doc. No. 171) to be admitted as full exhibits.

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        A.      The 40,000 Square Foot Space at Country Club Plaza. . . . . . . . . . . . . 5
                1.      History of the Space. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
                2.      Shaw's Efforts to Sublease the Property. . . . . . . . . . . . . . . . . 9
                3.      Shaw's Considers Options for the Space. . . . . . . . . . . . . . . . 11
        B.      Repair Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        C.      Condition of the Premises. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
                1.      Roof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
                2.      Masonry, Downspouts, and Gutters. . . . . . . . . . . . . . . . . . . . 16
                3.      Interior Walls and Doors. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                4.      Ceiling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
                5.      Floor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                6.      Exterior Windows and Doors. . . . . . . . . . . . . . . . . . . . . . . . . 21
                7.      Electrical, Mechanical, Plumbing, and HVAC. . . . . . . . . . . . . 21
        D.      Shaw's Turnback of the Property. . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.    CONCLUSIONS OF LAW: PLAINTIFFS' CLAIMS. . . . . . . . . . . . . . . . . . . . 23
        A.      Massachusetts Law Applies to Contract and Tort Claims. . . . . . . . . . . 23
        B.      CCA's Actions Did Not Terminate the Lease Prior to January 31, 2006
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        C.      Shaw's Repair Obligations: Governing Law
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                1.      Measure of Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                2.      Application of "Reasonable Wear and Tear" Exception. . . . . . . 31
                3.      Meaning of "Reasonable Wear and Tear". . . . . . . . . . . . . . . . 33
        D.      Shaw's Repair Obligations: Specific Obligations. . . . . . . . . . . . . . . . . 36
                1.      Roof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
                        a.      Legal Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . 36
                        b.      Application of Law to Fact. . . . . . . . . . . . . . . . . . . . . 38
                2.      Interior Walls and Doors. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
                3.      Ceiling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
                4.      Floor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
                5.      Exterior Windows and Doors. . . . . . . . . . . . . . . . . . . . . . . . . 43
                6.      Electrical, Mechanical, Plumbing, and HVAC. . . . . . . . . . . . . 43
        E.      Damages Calculation on Breach of Contract Claim. . . . . . . . . . . . . . 44

IV.     CONCLUSIONS OF LAW: AFFIRMATIVE DEFENSES. . . . . . . . . . . . . . . . 44
        A.      Statute of Limitations on CCA's Breach of Contract Claim. . . . . . . . . . 45
        B.      Unclean Hands. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        C.      Waiver and/or Estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        D.      Failure to Mitigate Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

2

V.      CONCLUSIONS OF LAW: COUNTERCLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . 47
        A.      Count One: Breach of Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
                1.      Breach of Contract in Denying Shaw's Request to Sublease. . . . 47
                2.      Breach of Contract / Covenant of Good Faith and Fair Dealing. . 48
                        a.      Giving Stop & Shop control over how CCA acted with regard
                                to the Shaw's space did not deprive Shaw's of its right to
                                operate a supermarket at the premises. . . . . . . . . . . . . . . 50
                        b.      CCA violated Shaw's exclusive rights under the Lease to
                                operate a grocery store at the premises by giving Stop &
                                Shop the same right. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
                        c.      CCA breached the Shaw's Lease by double-billing Shaw's
                                and Stop & Shop for common charges. . . . . . . . . . . . . . 52
        B.      Count Two: Unjust Enrichment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        C.      Count Three: Declaratory Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        D.      Count Four: Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        E.      Count Five: Connecticut Unfair Trade Practices Act. . . . . . . . . . . . . . . 58
        F.      Statute of Limitations on Counterclaims. . . . . . . . . . . . . . . . . . . . . . . . . 63


VI.     OTHER DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
        A.      Prejudgment Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
        B.      Attorney's Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
        C.      Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

VII.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## I.      INTRODUCTION

Plaintiffs Country Club Associates ("CCA"), a Connecticut partnership,[3] and Country Club Associates LLC, a Connecticut Limited Liability Corporation, bring this action against defendants Shaw's Supermarkets, Inc., and Albertson's Inc. (collectively, "Shaw's"), both corporations, for breach of contract.  CCA owns a parcel of land in Worcester, Massachusetts, at which Shaw's was a tenant.  CCA alleges that Shaw's breached its Lease by failing to return the demised premises to CCA, at the termination of its Lease, in the condition required by the Lease.

Shaw's contends that it returned the premises in the condition required by the Lease and thus owes no damages.  Furthermore, Shaw's alleges that CCA terminated its Lease, unbeknownst to Shaw's, six years prior to its originally scheduled termination date by leasing the same premises to a different tenant, Stop & Shop.  Shaw's counterclaims against CCA for rent and the share of common area maintenance (CAM) charges, taxes, and insurance (collectively, "common charges") that it paid to CCA from February 1, 2000, to January 31, 2006—the period Shaw's claims the Lease was terminated through the originally scheduled termination of the Lease.  The court held a bench trial in this matter from April 1-3, 2009.

---

[3]Country Club Associates, a Connecticut partnership, brought this suit.  After the lawsuit was started, Country Club Associates assigned its interest in the land, shopping center, and CCA's claim in this lawsuit against Shaw's to Country Club Associates LLC.  On December 17, 2007, CCA filed a motion to substitute Country Club Associates LLC for Country Club Associates.  On January 22, 2008, the court entered an order granting the motion in part by adding Country Club Plaza Associates LLC as a plaintiff.  It declined to terminate Country Club Associates as a party, providing that, "Whether Country Club Associates should remain as a party can be addressed by further motion, stipulation or at the pre-trial conference."  Shaw's counterclaim names only Country Club Associates.  Because Country Club Associates remains a party, and neither party raised this issue at pre-trial or trial, it is included in this court's judgment (as a plaintiff and counter-defendant).

II.     **FINDINGS OF FACT**[4]

    A.     <u>The 40,000 Square Foot Space at Country Club Plaza</u>

        1.     History of the Space

CCA owns a parcel of land on Lincoln Street in Worcester, Massachusetts. Defendant Shaw's Supermarkets, Inc., was a tenant in a shopping center, known as Country Club Plaza, constructed on the land owned by CCA.  The shopping center is a strip shopping center consisting of several adjacent buildings.

The largest space in the shopping center is a 40,000 square foot space (hereinafter, the "40,000 square foot space," "Shaw's space," or "supermarket space"). The 40,000 square foot space was initially leased to Iandoli's Supermarkets, Inc. on February 26, 1980.  <u>See</u> Ex. 1 (hereinafter "Shaw's Lease").  The Lease was amended on May 16, 1980 (First Amendment) and February 2, 1981 (Second Amendment).  The Lease was assigned by Iandoli's to Shaw's on October 19, 1987.  The Lease was amended that same day (Third Amendment).  Shaw's Lease provided for an expiration date of January 31, 2006, and provided for earlier termination under certain circumstances.

Shaw's operated a supermarket in the space from 1987 through about May 1, 1999, when Shaw's closed its store and removed its trade fixtures.  The store remained vacant through the scheduled end of Shaw's Lease on January 31, 2006.  Shaw's had retained keys to the premises after it closed the store and returned them to CCA on that

---

[4]Although the court has separated out findings of fact and conclusions of law to the extent possible, the complex nature of this case generates many mixed issues of fact and law, which the court must necessarily address jointly.

date.

In 1999, after the Shaw's store became vacant, CCA sought a new tenant for the space.  The Lease had a "go dark" provision, Section 8.1.3, which took effect six months after Shaw's vacated the premises.  The provision permitted CCA to send Shaw's a notice of termination.  Under that provision, upon being sent a notice of termination, Shaw's would have thirty days in which to reopen for business; if it did not do so, the Lease would be deemed terminated.

In 1999, CCA and Stop & Shop, a supermarket competitor of Shaw's, negotiated a lease for the 40,000 square foot space ("Master Lease I") and an adjoining 18,250 square foot space ("Master Lease II") (together, the "Master Leases").  As negotiated, the Master Leases between CCA and Stop & Shop provided that CCA would terminate Shaw's Lease in accordance with the "go dark" provision of the Shaw's Lease, and Stop & Shop would then take over possession and occupancy of the space.  Master Lease I, covering the 40,000 square foot space, would take effect upon termination of the Shaw's Lease and approval by CCA's first mortgagee, Nationwide Life Insurance Company.  CCA signed the two leases in January 2000 and presented them to Stop & Shop for its signature.  However, Stop & Shop did not sign the leases, and instead sought to renegotiate their terms.

The parties continued to negotiate in January 2000, and finally agreed to a First Amendment of Lease for each Master Lease that changed the terms of the Master Leases from their inception.  The original Stop & Shop Master Leases and First Amendments were executed in March 2000, and were made effective as of February 1, 2000.  Rather than CCA immediately terminating the Shaw's Lease, Master Lease I, as

6

amended, provided that the Shaw's Lease would remain in effect, but that Stop & Shop had the right to ask CCA to terminate the Shaw's Lease should Shaw's have sought to reopen.  As amended, Master Lease I provided that Stop & Shop would take possession of the 40,000 square foot space only upon the termination of the Shaw's Lease.  However, the First Amendment provided that, starting immediately, Stop & Shop would pay CCA an annual fixed sum plus a share of common charges, less payment by CCA to Stop & Shop of one-half of the rent and common charges paid by Shaw's to CCA under the Shaw's Lease.  Should Shaw's or a subtenant have chosen to reopen a supermarket in the space prior to Stop & Shop taking possession, Stop & Shop would no longer have owed the annual fixed sum or the share of common charges until such time as Stop & Shop received exclusive possession of the premises.

On January 31, 2000, Stop & Shop and CCA entered into a separate, non-disclosure agreement providing that neither party would disclose the lease arrangement, except to certain third parties for limited purposes.  The agreement explicitly provided that, "[u]nder no circumstances shall either party disclose any of the foregoing to [Shaw's] . . . without the express prior written consent of the other party."  This agreement also discussed Stop & Shop's intention to assign its interest in the leases to Worcester Lincoln Associates, LLC, a wholly owned entity, and provided that neither party would disclose who controlled the LLC.

Each lease year, from February 1, 2000 through January 31, 2006, CCA invoiced both Shaw's and Stop & Shop for rent and the share of common charges with regard to the 40,000 square foot space.  CCA also invoiced Stop & Shop for rent and common charges in accordance with Master Lease II, covering the 18,250 square foot

7

space.[5]  Both Shaw's and Stop & Shop paid CCA the sums due in accordance with

their respective leases.  CCA never informed Shaw's that Stop & Shop had an interest

in the 40,000 square foot space.  While by 2004, Shaw's had become aware that Stop

& Shop was leasing part of the premises, Shaw's did not discover, until after the

termination of the Shaw's Lease and the filing of the instant litigation, that Stop & Shop

also had a lease covering the Shaw's space.

Stop & Shop assigned its interest in the lease to Worcester Lincoln Associates,

LLC.  A notice of lease was recorded in the Worcester District (Massachusetts) Registry

of Deeds on March 24, 2000.

CCA never notified Shaw's that it was terminating the Shaw's Lease.  Shaw's

never sought to reopen a supermarket in the space during the final six years of its

Lease.

From February 2000 through January 2006, Stop & Shop paid CCA the amount

of $2,491,791.11, pursuant to its Lease of the 40,000 square foot space.[6]  During the

same time period, Shaw's paid CCA the amount of $2,197,827.42, including rent and its

pro rata share of common charges.  Shaw's paid an annual rent of $228,416.16 during

this period, or a total rent of $1,370,496.96.  See Ex. 167; 178; 192.  Therefore, by

subtraction, the amount Shaw's paid for common charges during this period was

---

[5]On the actual invoices, CCA combined the assessment of the common charges, assessing Stop
& Shop's share as 34.59%, which included the shares attributable to both the 40,000 square foot space
and the 18,250 square foot space.  Stop & Shop was also required to pay a 10% administrative fee on its
CAM charges, while Shaw's was required to pay a 15% administrative fee on those charges.

[6]The parties stipulated to this amount.  By the court's calculations, this number is likely net of the
$1,088,913.71 that CCA remitted to Stop & Shop.  This court so concludes because Stop & Shop's "key
money" owed for the 40,000 square foot space alone was $2,548,437.50 ($422,312.50 for the first five
years and $436,875.00 for the next year), plus Stop & Shop paid common charges.

$827,330.46.[7]  During that time, CCA remitted to Stop & Shop $1,088,913.71 of Shaw's payments pursuant to the agreement between CCA and Stop & Shop.

>    2.    Shaw's Efforts to Sublease the Property

The Shaw's Lease required CCA's consent to any proposed sublease.  Shaw's Lease, sections 8.2.1 and 8.2.2.  If Shaw's sought to sublease 30% or less of the Shaw's space, CCA pledged not to unreasonably withhold consent, but if Shaw's sought to sublease more than 30% of the premises, no conditions were placed on CCA's decision.  Id.

On October 31, 2000, Shaw's sent a letter to CCA's counsel requesting permission to sublease its space to a "supermarket warehouse fulfillment center."  Ex. 158.  Representatives of Shaw's and CCA then spoke by telephone regarding Shaw's request.  Shaw's representative, Steven Jackson, informed CCA's representative, Tamara Kagan Levine, that the fulfillment center was a warehouse facility that stored groceries and then sent them for home delivery in response to orders placed over the telephone or internet.

On November 9, 2000, Ms. Levine sent a letter to Shaw's denying the request.  She stated that permission was denied because the proposed use of the premises did not comply with the permitted use set forth in the Lease, and thus CCA did not approve of the sublease.  On November 22, 2000, Ms. Levine sent a letter to Stop & Shop's counsel regarding the matter.  CCA indicated in this letter that it believed it to be reasonable for the landlord to withhold consent based on the proposed change in use.

---

[7]It appears that Shaw's paid approximately $361,876.67 in CAM charges during this time and the remainder was for taxes and insurance.

In late 2000 or early January 2001, Jackson again contacted Levine and re-requested permission from CCA to use the premises as a warehouse fulfillment center despite the fact that the use was not permitted under the Shaw's Lease.  Shaw's proposed that, if CCA consented to the sublease, then Shaw's would agree that, if during the term of the sublease CCA were able to procure a retail tenant for the Shaw's space, CCA would then have the right to terminate and cancel the Shaw's Lease.

On January 8, 2001, Levine sent a letter to Stop & Shop and requested its consent to Shaw's request.  Levine detailed Shaw's proposal regarding the ability of CCA to recapture the space.  Levine indicated that neither Heflin nor Kagan (the principals of CCA) had any objection to Shaw's request, but told Stop & Shop that Heflin and Kagan "do not want to consent without your approval."  On January 10, 2001, Stop & Shop wrote a letter denying consent to Shaw's request.

Levine testified that CCA could not consent without Stop & Shop's approval.  In connection with Shaw's request to sublease, Levine reviewed the Stop & Shop Lease, determined that Stop & Shop's consent was required, and then attempted to obtain that consent.  When that consent was denied, CCA denied Shaw's request to sublease.  Shaw's was never informed of Stop & Shop's involvement, including the need for Stop & Shop to consent to Shaw's request.

Shaw's never presented a detailed request or proposal to sublease to CCA.  Nor did Shaw's challenge CCA's determination that a warehouse fulfillment center was not a permitted use.  However, Shaw's believed, after making several efforts to persuade CCA to sublease the space, that further efforts would be futile.

No fulfillment center was ever put into the Shaw's space.  After January 2001,

10

Shaw's did not make further request to assign or sublease the Shaw's premises during the remaining term of its Lease.

### 3.     Shaw's Considers Options for the Space

By 2004, Shaw's became aware that Stop & Shop had leased space in the Country Club Plaza.  Ex. 30 (internal Shaw's email from June 11, 2004, stating that "Stop N Shop, which is located across the street, master leases the remainder of the center where the store is located.").  The author of the email, Kerrigan McKay, testified that she was told by at least one other Shaw's employee that Stop & Shop had master leased the remainder of the center.  She had no idea, however, that Stop & Shop also had a lease on the Shaw's space.

In 2004, McKay, in her capacity as Shaw's manager for surplus properties, explored options for the space.  She considered pursuing a lease extension, but was directed by her supervisors not to do so.  McKay never made contact with CCA or otherwise inquired as to the terms of the Stop & Shop Lease, what space it covered, or the details of any restrictive covenants which may have been contained in the Lease. Nor did she make any requests of CCA to sublease or assign the space.

### B.     Repair Obligations

The Shaw's Lease obligated CCA to maintain in good repair, including replacement as required, the following: paving, sidewalks, canopies, gutters, downspouts, bumper guards or other traffic control systems, and underground utility lines situated outside of buildings in the Center.  CCA was also responsible for making all necessary repairs to the foundation, walls, and structural steel components.

11

The Lease obligated Shaw's to make all other repairs to the premises in order to keep them in good order and repair.  The Third Amendment to the Lease provided that the roof "shall be repaired and/or replaced as the same may be required by and at the sole expense" of Shaw's, and also provided that the roof "shall be repaired as the same may be required to ensure that it is weather tight during the term of this Lease by and at the sole expense of the Tenant."  Third Amendment to Shaw's Lease, sections 6.1 and 16.3.  Shaw's was also specifically responsible for damaged plate glass, except when due to the Landlord's act or negligence.

The Lease provided in several places for the removal of Shaw's trade fixtures at the expiration of the Lease, provided that Shaw's repaired, at its own expense, damage caused by the fixtures' removal.[8]  The Shaw's Lease required that, at the expiration of the Lease, Shaw's would yield up the Shaw's premises "broom clean and in the same good order and repair in which Tenant is obliged to keep and maintain the Premises by the provisions of this Lease, reasonable wear and tear excepted."

C.    Condition of the Premises

Several witnesses testified about the conditions of the premises, the necessity for repair or replacement, and the associated costs.  The testimony conflicted in certain key respects.  The court here considers the nature of the physical damage to the premises, and the associated costs of repair or replacement, that the court finds that CCA has established by a preponderance of the evidence.  In its legal analysis, infra,

---

[8]In section 3.9, the Lease provides that Tenant "may . . . replace, and/or remove Tenant's trade fixtures . . ." during the term or at the conclusion of the Lease.  In section 8.1.9, it refers to "remov[ing] all trade fixtures," and in the case of early termination, the Lease provides in section 8.1.3 that "Tenant shall vacate the Premises and remove all of its trade fixtures, equipment and inventory . . . ."

12

the court considers the extent to which Shaw's is liable for such physical damage, and the amount, if any, for which it is liable.

In November 2005, CCA arranged for a "building envelope evaluation" by Peterson Associates. A building envelope analysis covers the foundation of a building, exterior walls, doors, windows, the roof, and the structure supporting them. Peterson first visited the Shaw's premises on November 17, 2005, and returned approximately three more times to complete his evaluation. Peterson prepared a report in January 2006, and subsequently issued supplemental reports following a further visit in 2007. As of Peterson's visit in late 2005, Shaw's trade fixtures had been removed and the store was empty.

On January 31, 2006, Leon Bombardier visited the Shaw's premises in order to prepare an "existing conditions report." Following his visit, Bombardier prepared a report on the Shaw's premises dated February 9, 2006. Bombardier made a second trip in February 2007, and prepared a second report dated April 2, 2007.

In approximately August of 2007, Richard Gorham visited the Shaw's premises to evaluate the roof. No repair work had been performed on the roof since late 2005.

### 1. Roof

The Shaw's premises has a standing seam metal roof, installed around 1980. In this type of roof, which Bombardier described as a low cost solution, metal roof panels sit atop fiberglass insulation that has a vinyl face. The Shaw's roof had penetrations for mechanical equipment and plumbing vents.

At the termination of Shaw's Lease, the roof was in need of repair. It exhibited numerous small leaks—at least 20-25 in all—and rusted portions, though major rusting

13

occurred only on two panels.  These two panels, on the same side of the roof, one towards the front and one towards the back, exhibited major leaks.  Many of the leaks were in the area of roof penetrations.  At these points, the roof's metal panels exhibited extensive corrosion and holes in the roof, reflecting the effect of years' worth of water. At one of these locations, there was rusting underneath the roof supports.

There were abandoned, rusted equipment stands and debris on the roof, as well as air conditioning units.  Metal debris on the roof had corroded and that corrosion had also led to corrosion on the roof itself.  The roof exhibited surface rust in numerous places, indicating a lack of maintenance.  This rust was particularly visible near an air conditioner, on the interior of flashing, on assorted fasteners, and at rain collars on pipes.  The pipes themselves also exhibited rusting and corrosion.

Seams in the metal roofing panels exhibited corrosion and some water staining. The roof had numerous penetrations, including pipes, fans, and ductwork.  These penetrations had sealing between the penetration and the roof, known as flashing. Visual inspections of the roof revealed prior attempts to repair the transition seams and the flashing on the skylights and other parts of the roof through the use of sealants and caulkings.  The product used for at least some repairs was uncured EPDM, a rubber-based product used in the original flashing on the skylights and on repairs to the flashing at the skylights, the step-up joint between the main roof and the vestibule, and in the end-lap.  The penetrations, horizontal joint, and lap joint system all exhibited evidence of resealing.  These repair jobs likely stopped leakage for a time, but ultimately the leakage reoccurred.  Fasteners also exhibited corrosion.  The leaks in the roof also resulted in wet insulation, and thus the insulation needed to be replaced.

14

Witnesses presented several options for fixing the roof.  Peterson contended that the best solution for long term roof life would be to install a new roof membrane system, along with new insulation.  He estimated the cost for that option to be approximately $600,000.  He acknowledged, however, that repairing the roof was also an option.  He estimated that application of a liquid-applied membrane and repair of the seams would cost approximately $5.50-$6 per square foot, for a total of $220,000 to $240,000 (based upon a 40,000 square foot roof), plus additional roofing related costs.  Bombardier suggested that the roof be repaired by treating the rust spots, reflashing the penetrations, and then installing a liquid coating rather than rubber membranes over the entire roof.  Bombardier estimated that this coating system would last for 15-20 years.  Bombardier's associate, John King, consulted with a roofing contractor, who, after visiting the site, concluded that a coating system was appropriate and that the cost of doing the work, including an additional allowance for contingency costs, was $100,000.  Gorham recommended that any roof repair undertaken include normal maintenance, specifically wire brushing and painting equipment support frames, wire brushing and painting or replacing rain collars, repair of the deteriorated metal panel over the front vestibule, and restripping.

The court credits the testimony of Bombardier, King, and Gorham, and the acknowledgment of Peterson, that repairing the roof by applying a liquid coating, rather than installing a completely new roof membrane system, was a viable repair option.  In other words, it would make the roof "weather tight."  See Third Amendment to Shaw's Lease, section 16.3.  The court finds that the cost of doing this repair would be $125,000.  The court comes to this conclusion by crediting the approximately $100,000

15

figure for the liquid coating provided by Bombardier and King, who consulted with a roofing contractor who made an onsite visit specifically to evaluate the cost of the roof repair.  King, however, testified that this amount only included a limited allowance for patching, and Gorham testified that other normal maintenance items were required. The court finds, based upon the testimony and a review of the photographs, that the roof needed more extensive patching and maintenance.  It therefore finds the cost of repairing the roof to be $125,000, because it finds that this amount adequately takes account of the additional repairs necessary to the roof in order for the liquid coating to be effective.

2.	Masonry, Downspouts, and Gutters

As a drainage mechanism, the roof sloped from front to back, where it met a gutter and downspouts.  At the time of the termination of the Shaw's Lease, the gutters along the back edge were blocked by weed-like vegetation and an accumulation of debris.  The gutters were in need of repair.  There were no gutters along the front edge of the roof.  At least two out of the four downspouts were damaged, deteriorating, and improperly terminated—that is, they were missing their bottom sections.

One of the improperly terminated downspouts allowed the water to run down the wall instead of away from the building.  This moisture, along with ordinary outside moisture caused by the elements, wore out the concrete in the wall and contributed to the rusting of metal siding in the vicinity of the loading dock along the back wall.  The moisture entering the rear wall also contributed to the growth of mold and mildew on the back wall and to water damage in the electrical room.  The brick and mortar formed a cavity wall—that is, a double wall with air space (a "cavity") and flashing materials inside

16

of the cavity.  However, moisture infiltrated the building through the metal wall panels after passing the masonry wall.  The wall let moisture into the store, accounting for about 5% of the total moisture contributing to mold and mildew in the store.  The use of the facility as a supermarket contributed to about 20% of the mold and mildew, while 75% resulted from the leaky roof.

About 2,000 square feet of the masonry walls needed repointing, caulking needed to be done, and about 300 linear feet of masonry controlled joints needed to be repaired, at an estimated cost of $25,000.  The foundation was also cracked and required repair.

### 3.   Interior Walls and Doors

At the time of the termination of the Shaw's Lease, the drywall exhibited extensive mold and mildew.  Wallboard was missing in a few places, with visible studs showing through.  At those points, the visible studs were themselves encased in mold and mildew, exhibited extensive deterioration, and required replacement.  The partition wall, which separated the store itself from the food storage areas and had gypsum wallboard on one side, was covered with active mold.  The presence of mold and mildew was confirmed by laboratory analysis.

Sources of mold and mildew included the leaky roof which made the walls, floors, and ceilings wet.  It also included the water coming in through the masonry wall and metal wall panels as a result of the faulty gutters and downspouts.  This contributed to some of the damage on the back wall and the floor, but not to the partition wall or front or side walls.  Finally, the operation of the store as a supermarket—particularly the placement of deli cases—also contributed water to the interior of the store through

17

condensation and leakage, and thus contributed to the mold and mildew problem.

Black staining was particularly apparent where the refrigeration cases were.  Aside from

the mold and mildew, damage to the gypsum wallboard was also the result of physical

damage, including wear and tear over the years in which the store was in operation.

The extent of the infestation required removal of the interior walls containing

mold and mildew, and their replacement, at a cost of $25,000.  The doors also required

replacement, at a cost of $6,000.

4.    Ceiling

In the fall of 2005, the ceiling was in poor condition, primarily as a result of the

roof leaks above.  Numerous ceiling tiles had fallen from the ceiling to the floor, and

were wet and deteriorated.  Others still on the ceiling were sagging and discolored.

There was rust and corrosion on the ceiling grid and ducts.  In one of the corners, the

ceiling grid was hanging down and had come unattached.  Florescent light fixtures in

the ceiling showed staining where leaks had carried insulation into the light fixtures.

Debris from fallen ceiling tiles rested on the floor, and mold and mildew was apparent

on the fallen ceiling tile panels.  While the vast majority of ceiling tile damage is

attributable to the roof leaks, ceiling tiles also became discolored through ordinary use

of the property as a supermarket.  Peterson testified that at least 50% of the ceiling tiles

were damaged and required replacement, and that in fact the entire ceiling should be

replaced at a cost of $198,000.

Around the time of Peterson's visit in late 2005, Shaw's undertook to repair

damaged ceiling tile.  Bombardier testified that immediately following the repair, about

5% of the ceiling tile remained missing, damaged, or otherwise not usable, and could

18

be repaired or replaced at a cost of $3000.  The court credits the testimony that Shaw's undertook a partially-successful repair in late 2005.

When Gorham visited the premises in 2007, there were again stained ceiling tiles, missing ceiling tiles, debris from fallen ceiling tiles on the floor visible in numerous places, and the ceiling grid in one of the corners was hanging down.  The court finds that the roof had continued to leak following Shaw's ceiling tile repair job in late 2005, and that by 2007, the ceiling was again damaged as a result of these leaks.

    5.    Floor

At the time of the termination of the Shaw's Lease, the floor exhibited a need for repair in various locations.  Some floor tiles were loose, detached, and lifting up off the floor, or missing altogether.  The mezzanine level above the main floor exhibited peeling, discolored tiles.  Fallen ceiling tiles resided on certain areas of the floor, contributing to mold or mildew on the floor.  Some areas of the floor had been wet for an extensive period of time.  Areas of the floor where refrigeration or deli cases had been were in particularly poor shape, and exhibited mold, staining, or mildew. Along the column line, where grocery shelves had been removed, some tiles were missing or loose.  The tile was broken and stained where the cash registers had been. The floor was dirty and had a buildup of cleaner and wax residue, particularly under the areas where the grocery shelves had been.  There was mold and mildew in the residue. There were holes or trenches cut in the floor at various places. The moisture on the floor had three sources: the rear masonry wall, sources related to the use of the facility as a supermarket, and the leaking roof.

19

Again, the witnesses disputed the required repairs and their cost.  Peterson suggested that all existing tiles should be removed, that the holes in the concrete should be patched, and that the floor slab should be leveled, and that a new tile floor should be put down, at a cost of $277,000.  He acknowledged, however, that other measures short of replacing the entire floor could be taken.  Bombardier suggested that the floor be cleaned and the small number of damaged tiles be replaced for an approximate cost of $6,000—$2,000 for cleaning and $4,000 for tile replacement.  Bombardier estimated that the quarry tiles in particular would cost $2,500 to repair.  The court concludes that the similarly-sized mezzanine area would also cost $2,500 to repair.

Consistent with Bombardier's testimony and Peterson's acknowledgment, the court finds that the floor could be repaired rather than replaced.  Based upon the testimony of several witnesses and a review of the photographs (Ex. 50), the court concludes as follows.  The tiles in the mezzanine and quarry tile areas were sufficiently damaged as to require complete replacement.  See Exs. 50-28, 50-29, 50-32, 50-54, 50-56.  Of the main floor area of the store exclusive of the mezzanine and quarry tile areas, the court determines that approximately 15% of the tile, predominantly in the areas of the cash registers, some of the case work, and adjacent to walls, required full replacement as a result of extensive physical damage and mold and mildew.  Therefore, the pro rata replacement cost for the tile replacement in the main floor area is $41,550 (15% of $277,000), while the replacement cost for the mezzanine tile is $2,500 and the replacement cost for the quarry tile is $2,500.

6.      Exterior Windows and Doors

The plate glass storefront windows were boarded up on the exterior side, and all were broken.  The windows were broken as a result of vandalism.  Neither CCA nor Shaw's provided security at the premises after the Shaw's store closed.  The main entrance doors were broken and the glass on them was broken; metal doors in other areas of the building were deteriorated and rusted.  Most of the glass panels within the windows and doors, known as glazings, needed replacement.  The court credits Peterson's testimony that restoring and replacing the windows (including the glazings) would cost approximately $40,000.

7.      Electrical, Mechanical, Plumbing, and HVAC

Electrical, mechanical, and plumbing components were also deteriorated, and exhibited signs of rust and corrosion.  The gas-fired hot water tank had non-functional burners, and the hot water system was missing necessary pipes.  One air handler was missing entirely, and a second air handler was non-functional.  Controls on the HVAC system were missing and wires had been cut, rendering them non-functional.  The building's air conditioning system in the building was also non-functional; wiring and piping were disconnected.  The building had two boilers, one of which was functional, the other of which was non-functional.  It had missing wiring, and its plumbing was disconnected.  The electrical systems were functioning, though many circuits were disconnected, junction boxes were uncovered, and electrical wiring was left exposed.

Roof leaks at mechanical equipment flashing locations, pipe stanchions, and other locations of abandoned equipment contributed to corrosion of the electrical, mechanical, and plumbing systems.  The ceiling in the electrical control room exhibited

21

damage.

Neither party introduced admissible evidence as to the cost of repairs to the electrical, mechanical, plumbing, or HVAC systems.

      D.    <u>Shaw's Turnback of the Property</u>

As the lease end date approached, in October 2005, Amy Zeytoonian of Shaw's scheduled a walk through with several other Shaw's employees, including John Ferranti and a maintenance representative. The parties exchanged letters and telephone calls regarding the repair requirements, Shaw's lease obligations, and the conditions of the store.

During his October 2005 visit, John Ferranti, on behalf of Shaw's, directed maintenance personnel, including maintenance representative David Morris, to replace bad ceiling tiles, recaulk a leaking portion of the roof, make repairs to the skylights by applying sealants, and make repairs to HVAC units. Ferranti had a pallet of ceiling tiles delivered to the store, and it was used to replace stained, discolored, or wet ceiling tiles. Ferranti made a second visit in November of 2005. On the second visit, the ceiling tiles had been replaced, and Ferranti did not observe further stains on the ceiling tiles. Shaw's did not replace the tile, clean the floor, do other work on the floor, or replace the broken glass.

A meeting took place between the parties on November 17, 2005. The parties exchanged letters in December 2005 and January 2006 regarding the condition of the store and their respective repair obligations. In a letter of January 18, 2006, Shaw's indicated that it would take responsibility for plate glass replacement and missing ceiling tiles, and that it would ensure that the roof was water tight, but that it would not replace

the roof.  The parties failed to agree on a resolution of their obligations, and CCA filed

the instant lawsuit.

### III.      CONCLUSIONS OF LAW: PLAINTIFFS' CLAIMS

#### A.      Massachusetts Law Applies to Contract and Tort Claims

The parties agree that the Lease is governed by Massachusetts law.  See

Shaw's Proposed Findings of Fact and Conclusions of Law at 15 ("Shaw's PFFCL");

CCA's Proposed Findings of Fact and Conclusions of Law at 33-34 & n.3 ("CCA's

PFFCL").  The court finds no reason to disregard this proposed conclusion.  Where

parties to a contract choose a particular state's law to govern the contract, Connecticut

honors that choice unless "the chosen state has no substantial relationship to the

parties or transaction" or "application of the law of the chosen state would be contrary to

a fundamental policy of a state which . . . would be the state of the applicable law in the

absence of an effective choice of law by the parties." Elgar v. Elgar, 238 Conn. 839,

850 (1996) (citing Restatement (Second) Conflict of Laws § 187).  Because the Lease

concerned premises situated in Massachusetts, Massachusetts clearly has a

substantial relationship to the transaction. Therefore, Massachusetts law will govern

contract claims and defenses.

With regard to tort claims, traditionally, Connecticut courts applied the common

law doctrine of lex loci delicti, that "the substantive rights and obligations arising out of a

tort controversy are determined by the law of the place of injury."  O'Connor v.

O'Connor, 261 Conn. 632, 637 (1986).  Where "application of the doctrine of lex loci

would produce an arbitrary, irrational result," Connecticut courts look to the

Restatement instead.  O'Connor, 261 Conn. at 649-50.  "Recently, courts applying

23

Connecticut choice-of-law law have used the Restatement approach even where lex loci would lead to the same result." United States Fidelity & Guaranty Co. v. S.B. Phillips Co., Inc., 359 F. Supp. 2d 189, 206 (D. Conn. 2005). This court will "follow the trend" and apply the "most significant relationship" analysis set forth in Sections 6 and 145 of the Restatement (Second) that the Connecticut Supreme Court adopted in O'Connor. Id.

The Restatement (Second) provides that, "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement 2d of Conflict of Laws ("Rest. 2d"), § 145(1). Section 6 of the Restatement provides that, absent a statutory directive:

> the factors relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Rest. 2d, § 6(2). The choice of law analysis set forth in sections 145 and 6 are applied by "weighing . . . the relative significance of the various factors that § 6 lists." O'Connor, 201 Conn. at 651.

To assist in the evaluation of these policy choices, the Restatement provides further guidance:

> Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

24

Rest. 2d, § 145(2). The relative importance of these contacts is determined with respect to the issue at hand.  Id.

The court finds that the Restatement factors point in favor of applying Massachusetts law to Shaw's tort claims.  Connecticut has some interest in the litigation: the allegedly tortious acts were undertaken by a partnership based in Connecticut, and Shaw's paid rent to the partnership in Connecticut for most of the duration of the contract.  However, Massachusetts has the most significant relationship to the occurrences at issue in this case, and on balance, the factors favor applying Massachusetts law.  The Plaza is situated in Massachusetts.  The parties have agreed that Massachusetts law governs their contract claims.  Therefore, Massachusetts has a relatively greater interest in the case and, based upon the contract, the parties have an expectation that Massachusetts law will apply to their claims.  Furthermore, prior to being acquired by Albertson's towards the end of the time period at issue in this litigation, Shaw's was domiciled in Massachusetts.  While the partnership was domiciled in Connecticut, its place of business, for purposes of the issues in this case, can be considered to be the Plaza, situated in Massachusetts.  The court will therefore apply Massachusetts law to Shaw's tort claims as well.

        B.    CCA's Actions Did Not Terminate the Lease Prior to January 31, 2006

The ability of plaintiffs to recover on their claim for damages may be affected by the court's determination of an issue raised in Shaw's counterclaim: whether Shaw's Lease was terminated prior to January 31, 2006.  The court will therefore turn to a discussion of the lease termination before addressing Shaw's repair obligations under the Lease and the remainder of Shaw's counterclaim.

The court finds that Shaw's Lease was not terminated either by virtue of CCA and Stop & Shop entering into Master Lease I or by any actions undertaken by CCA or Stop & Shop during the term of the Shaw's Lease.  The Shaw's Lease did not terminate by its terms.  No condition occurred under the provisions of the Lease which would have terminated it: CCA never provided Shaw's with a notice of termination under the Lease, nor did Shaw's attempt to terminate the Lease or cease paying rent or common charges to CCA.  No novation, accord and satisfaction, or release took place.  There was no mutual agreement between CCA and Shaw's to release Shaw's from its Lease obligations, nor did CCA exhibit an intent to do so.  CCA never exercised the "go dark" provision or sought to terminate Shaw's tenancy.  Shaw's could have chosen to reopen a supermarket in the 40,000 square foot space at any time during the balance of its term and, only if it was unable to do so within thirty days, would CCA have had the right to terminate its Lease.[9]

As evidence for its claim that CCA substituted Stop & Shop for Shaw's as the tenant in the 40,000 square foot space as of February 1, 2000, Shaw's points to bills and other correspondence issued by CCA that refer to Stop & Shop's "occupancy," and the invoicing of Stop & Shop for "rent" rather than "key money" as provided in the First Amendment to Master Lease I.  Additionally, after the Shaw's store went dark, CCA had prepared various offering brochures in conjunction with contemplated offerings of the complex.  In each of the brochures presented as evidence, the list of tenants included

---

[9]Thirty days may be an unrealistic time period within which to reopen a closed supermarket, but it is the term the parties negotiated, and the court concludes, in the absence of evidence regarding the practical effectiveness of Shaw's right to reopen or that the lease provision meant something other than its plain language, that Shaw's had a right to reopen that it could have exercised.

Stop & Shop, but not Shaw's.  Shaw's contends that this behavior reflects CCA acting in a manner consistent with Shaw's no longer being a tenant in the complex.  CCA counters that the brochures were intended to reflect future cash flow available to a purchaser of the Plaza, and because the Shaw's Lease was coming to the end of its term and would be replaced by the Stop & Shop Lease, the interest of a purchaser would be in the Stop & Shop cash flow.  Regardless of CCA's motivation in referring to Stop & Shop as a tenant or in having the brochures prepared, however, the fact remains that the Shaw's Lease was never terminated by its terms, CCA continued to invoice Shaw's for rent and common charges, and Shaw's continued to pay those charges.

Master Lease I, as amended, did not provide Stop & Shop with possessory rights in the 40,000 square foot space until the Shaw's Lease terminated by its terms.  Stop & Shop and CCA recognized as much in their First Amendment of Lease.  Legally, CCA could not transfer a greater interest than it had, which was a reversion following the termination of the Shaw's Lease and the right to terminate the Lease and retake the premises prior to the lease's end date under certain defined circumstances.  CCA never engaged in a constructive eviction of Shaw's or otherwise violated Shaw's covenant of quiet enjoyment, as neither CCA nor Stop & Shop ever interfered with Shaw's possessory rights in the space.

The court recognizes that the existence of the Stop & Shop Master Leases, and CCA's obligations under those leases, clearly incentivized CCA to behave in a manner less conducive to Shaw's interests than the manner in which a cooperative landlord might otherwise have behaved.  Had Shaw's chosen to reopen, CCA would no longer

27

have been able to collect money from Stop & Shop under the First Amendment, and CCA therefore had a financial interest in the premises remaining "dark."  Absent the Stop & Shop agreements, CCA might actively have sought another tenant in order to increase foot traffic in the shopping center and then terminated the Shaw's Lease (which would have relieved Shaw's from the obligation to pay rent and common charges), or it might have agreed to Shaw's request to sublease.

Furthermore, as Shaw's emphasizes, CCA effectively gave rights of control that it had as landlord over to Stop & Shop in exchange for the payment of "key money."  In fact, the Stop & Shop leases, as modified by the First Amendment, provided that CCA would be obligated to exercise its right of termination in the Shaw's Lease at Stop & Shop's request.  Yet because CCA did not give rights to Stop & Shop that CCA could not itself have exercised under the Shaw's Lease, this effective transfer of rights did not breach the Shaw's Lease.  CCA was under no obligation to act in Shaw's interests, provided that it acted consistent with its obligations under the Lease.  Because no lease provision restricted CCA's right to assign the Lease, CCA could even have chosen to sell the premises to Stop & Shop, at which point Stop & Shop would have succeeded to CCA's rights under the Shaw's Lease.  See 33 Mass. Prac., Landlord and Tenant Law § 8:2 (3d ed. 2000-2008) ("A lessor has the right to convey his reversionary interest in the leasehold or assign any rights he may have in the lease of a tenancy for years.").  As a competitor of Shaw's, Stop & Shop likely would have acted against Shaw's interests in much the manner that CCA did after CCA effectively agreed to allow Stop & Shop to dictate how it exercised its discretion to terminate and permit subleases.  Provided that Stop & Shop, as owner, did not violate the Shaw's Lease or governing law, Shaw's

28

would not have had any recourse.

CCA's actions, including invoicing Stop & Shop for "rent" and failing to list Shaw's on offering brochures, did not serve to terminate Shaw's Lease.  Because Shaw's remained in possession of the premises through January 31, 2006, and CCA's actions never actually dispossessed Shaw's, the court concludes that the Shaw's Lease did not terminate until January 31, 2006.

C.      Shaw's Repair Obligations: Governing Law

The parties dispute the appropriate measure of damages.  The parties also dispute the meaning of "reasonable wear and tear" and the extent to which it alleviates Shaw's repair obligations.  The court will address these issues before turning to more specific disputes over the parties' respective repair obligations.

1.      Measure of Damages

CCA contends that the measure of damages is the cost of repairs.  CCA's PFFCL at 12.  Shaw's agrees that, generally, Massachusetts law provides that the measure of damages for failure to repair is the cost of repair.  Def.'s Bench Memo. at 12.  However, Shaw's contends that where the cost to repair the property would greatly exceed the actual value of the property, or where awarding the cost of repair would be unjust or would otherwise overcompensate the landlord, then diminution in value is a more appropriate measure.  Id.

"The general rule for measuring property damage is diminution in market value." Trinity Church v. John Hancock Mut. Life Ins. Co., 399 Mass. 42, 48 (1987).  "If the injury is reasonably curable by repairs, the expense of repairs, if less than the diminished market value, is the measure of recovery."  Belkus v. City of Brockton, 282

29

Mass. 285, 288 (1933); see also In re Malden Mills Industries, Inc., 303 B.R. 688, 698 (B.A.P. 1st Cir. 2004).  In practice, these tests tend to merge together, as "most courts applying the diminution in fair market value test use repair costs as either the measure of damages or as evidence of the extent of the diminution."  Malden Mills, 303 B.R. at 698.

The ability to recover for repair costs, though, is limited in several respects.  First, as noted, the ceiling on recoverable repair costs is the reduction in market value. Belkus, 282 Mass. at 288.  Second, a plaintiff "is not to be put in a better position than it would have been if the defendant had performed the terms of the lease."  Crystal Concrete Corp. v. Town of Braintree, 309 Mass. 463, 470 (1971).  That is, not only can a plaintiff not recover repair costs that "put a structure in a better condition than it was before the injury," Malden Mills, 303 B.R. at 698, but the court must also consider factors such as the "location and character of the demised premises," Crystal Concrete, 309 Mass. at 470.  If the value of the premises is such that "the incurrence of expense for repairs would not be a reasonable, practical or economical method of dealing with the property," id. at 470, then the expenses are not recoverable.

While Shaw's suggests that diminution in value is a more appropriate measure of damages in this case, neither party has presented evidence as to the market value of the premises.  The court must therefore rely on evidence as to the cost of repairs in determining the appropriate measure of damages.  In deciding what repair costs to award, the court will consider the Supreme Judicial Court's admonition in Crystal Concrete as to the limitations on recoverable damages.

2.      Application of "Reasonable Wear and Tear" Exception

The court must also consider the extent to which CCA can hold Shaw's liable for necessary repairs.  The Lease provides that, at the expiration of the term, Shaw's shall yield up the Premises "in the same good order and repair in which Tenant is obliged to keep and maintain the Premises by the provisions of this Lease, reasonable wear and tear excepted."  Various provisions in the Lease requiring Shaw's to make repairs during the duration of the lease term do not except reasonable wear and tear.  See Shaw's Lease, sections 3.9 and 16.3.  The court nevertheless determines that in this litigation brought after the termination of the Lease, Shaw's obligation is qualified by the exception for "reasonable wear and tear."

In Corbett v. Derman Shoe Co., 338 Mass. 405 (1959), the court considered a contract that included a "repair" covenant requiring the lessee to make repairs costing above $500 per year at its own cost and expense to keep the premises in the same condition as at the commencement of the Lease, and a separate "redelivery" covenant providing that at the end of the term, the lessee was to deliver the premises in "good order and condition, reasonable use and wearing thereof . . . excepted."  Id. at 406-07. The action was brought during the lease term on the repair covenant.  The court held that the covenants were to be "construed together" and held that the lessee undertook "to make whatever repairs were necessary to maintain the [original] condition of the premises . . . except for the effect, notwithstanding the making of such repairs, of reasonable use, exposure to the element, and aging."  Id. at 409.  The court further concluded, however, that because the repair covenant did not contain the same exception for "reasonable wear and tear" as the redelivery covenant, an action could be

31

brought for breach of lessee's affirmative obligation to repair, and the burden would be on the lessee to show that some of the charged repairs were due to "excusable use and wearing" qualification under the redelivery covenant.  Id. at 412-13.

Corbett offers ambiguous guidance on the extent to which a provision excepting reasonable wear and tear in a redelivery covenant qualifies a separate repair covenant not containing such a provision.  However, even if Corbett can be said to stand for the principle that a lessor can sue on a repair covenant to recover for even reasonable wear and tear, when that repair covenant is not expressly qualified to except reasonable wear and tear, Corbett is distinguishable.  First, the action in the instant case was brought after the termination of the Lease.  Second, CCA appears to concede that the exception for "reasonable wear and tear" applies to its suit to recover for the condition in which Shaw's "left the premises."  See CCA's PFFCL at 27 n.1 ("[T]hese damages are based on the cost to repair the premises, as required by the Lease, in order to fulfill Shaw's return [sic] the premises in good order and repair at the end of its tenancy, normal wear and tear excepted . . . .").  As such, the court construes CCA's suit as one primarily for breach of the redelivery covenant, in which the repair obligation is qualified by an exception for reasonable wear and tear.  Construing the clauses together as Corbett directs, the court determines as follows.  Insofar as the various repair clauses provide for the specific obligations of both parties with regard to repairs, and the redelivery clause specifically requires Shaw's to yield up the premises "in the same good order and repair in which Tenant is obliged to keep and maintain the Premises by the provisions of this Lease," the court will look to the repair clauses to determine the intent of the parties as to Shaw's repair obligations.  That is, CCA may

32

hold Shaw's liable for the cost of repairs necessary to fulfill Shaw's obligation under the various repair covenants and redelivery covenant, reasonable wear and tear excepted and subject to the limitations of Crystal Concrete as discussed supra.

        3.    Meaning of "Reasonable Wear and Tear"

The court must now determine the meaning of "reasonable wear and tear" as used in the contract's redelivery covenant.  Shaw's urges the court that it satisfied the obligations of the redelivery covenant because CCA was able to rent the property for a twenty-year term following the termination of Shaw's Lease.  In support of its claim, Shaw's points to the case of Ryan v. Boston Housing Authority, in which the court stated that, "A covenant that the tenant shall surrender the premises at the end of the lease 'in good order and repair, reasonable wear and tear excepted,' means that he shall turn over the premises in rentable condition."  322 Mass. 299, 301 (1948) (citation omitted).  Ryan involved a personal injury suit by a tenant against her landlord for negligently having repaired a sink in the tenant's apartment, which resulted in injury to the tenant.  The court construed the redelivery covenant in the context of discussing the relative duties of the landlord and tenant to make repairs during the term of the Lease, and after addressing several provisions that might bear on a duty to repair, concluded that "neither party had undertaken any duty of repair during the tenancy."  Id. at 301-02.  By contrast, the contract between CCA and Shaw's provided for duties to repair on the part of both CCA and Shaw's, and the redelivery covenant in the contract specifically incorporated the Tenant's repair obligations as stated elsewhere in the Lease.  Ryan is therefore distinguishable.

The Massachusetts Supreme Judicial Court has construed leases requiring that a lessee keep the premises in repair during the lease term and yield up the premises "in good tenantable repair" with "reasonable wearing and use thereof" excepted.  See, e.g., Codman v. Hygrade Food Prods. Corp. of N.Y., 295 Mass. 195, 196 (1936); Kaplan v. Flynn, 255 Mass. 127, 129 (1926).  While the Shaw's Lease does not use the precise phrases "good tenantable repair" or "reasonable wearing and use," it similarly obligates Shaw's to undertake repairs and to yield up the premises in "the same good order and repair . . . reasonable wear and tear excepted."  The cases can therefore provide useful guidance on interpreting the Lease in the instant case.

Kaplan involved a cheaply constructed movie theater, used by a daily average of 1,500 patrons, with the result that the "wear and tear on the theater [was] severe."  Id. at 129.  The court held that in analyzing the lessee's obligations,

> Conditions must be taken into account and the character of the construction must be considered.  The covenant in question must also be considered with reference to the use the premises were to be put to and the business to be carried on.

255 Mass. at 130 (internal citation omitted).  Similarly, in Codman, the court considered the fact that the defendant used the building for the contemplated purpose, in that case a sausage factory, and that "[d]ampness in the building and the presence of some water on the floors were necessarily incident to the use of the building for the conduct of that business."  295 Mass. at 197.  In determining a lessee's obligations under such a covenant, the court explained that:

34

> [V]arious things are to be taken into account.  Among these are the character of the building and of its original construction, the use to which the building is to be put and the character of a business there to be carried on, the age of the building and its general capacity for use at the time the lease is given, and the class of tenant and the kind of business of a tenant who would be likely to lease the building.

Id. at 198.  The Codman court also explained the effect of the "reasonable wearing and use" clause:

> The covenant on which the present action is based required that the defendant should deliver up the premises at the end of the term 'in good tenantable repair.' . . . The covenant would not necessarily be broken if, at the time of delivery to the lessors, the building was not in fact in good tenantable repair. For the covenant further provides that any effect, on the then existing state of repair, of reasonable wearing and use by the tenant is to be disregarded in determining whether or not the building was, at the time of delivery, in good tenantable repair.

Id. at 200.  Shaw's repair obligations at the time of redelivery are similarly qualified by the "reasonable wear and tear" provision in the Shaw's Lease.  Shaw's is not liable for deterioration resulting from the ordinary use of the premises as a supermarket over the twenty year period the building was occupied.  With the exception of the roof,[10] which was governed by a specifically negotiated amendment to the contract and therefore warrants a separate discussion, Shaw's is not liable for the repair or replacement of items which were properly used and were simply worn out at the end of their natural life expectancy.  Nor is Shaw's liable for the ordinary depreciation or wear caused by the elements and the passage of time.  Shaw's is liable, however, for damage caused, or exacerbated, by Shaw's failure to exercise ordinary care in repairing the premises as required by the Lease.  This includes liability for damage caused by the elements where such damage is exacerbated by Shaw's failure to undertake required repairs.

---

[10]The roof is discussed in more detail, infra.

D.      Shaw's Repair Obligations: Specific Obligations

The parties dispute whether Shaw's obligation to repair the roof and maintain it "weather tight" obligates Shaw's to replace the roof or to repair it.  At the time of the various inspections, the premises exhibited physical damage, including water damage, mold, and mildew.  The parties dispute the extent to which the water damage was caused by the failure of Shaw's to maintain certain items in good repair, chiefly the roof, the failure of CCA to maintain other items in good repair, chiefly the gutters, downspouts, and walls, or simply the reasonable wear and tear expected from use of the premises as a supermarket.  Finally, the parties dispute whether CCA's obligation to maintain "walls" covers only bearing walls or includes interior walls.

1.      Roof

a.      Legal Obligations

With respect to the roof, the Lease exhibits some ambiguity on the nature of Shaw's obligations, which the court resolves by construing the two clauses that address the roof, along with the redelivery covenant, in a manner that the court finds best reflects the intent of the parties as expressed in all three clauses.  The Third Amendment contains two separate provisions dealing with the roof.  The first clause provides as follows:

> Notwithstanding anything contained in this Lease to the contrary, repair, maintenance and replacement of the roof on the Shopping Center shall not be a part of common area maintenance; the roof of the Demised Premises shall be repaired and/or replaced as the same may be required by and at the sole expense of Tenant.

Third Amendment to Shaw's Lease, section 6.1.  This first clause modifies the section of the Lease, 6.1, that addresses CCA's obligation to maintain, repair, and/or replace

common area items.  Because of its location in the Lease, the court finds that this

clause was intended to remove the roof from the delineated list of items for which CCA

is responsible for maintaining, repairing, and/or replacing, and thereby to place

responsibility for the roof on Shaw's.  The second clause provides as follows:

> [T]he roof of the Premises shall be repaired as the same may be required to
> ensure that it is weather tight during the term of this Lease by and at the sole
> expense of the Tenant . . . .

Third Amendment to Shaw's Lease, section 16.3.  This second clause modifies the

section of the Lease, 16.3, that addresses Shaw's obligations to make all repairs not

specifically allocated to CCA.  The court interprets this clause as delineating the nature

of the repairs to the roof that Shaw's is obligated to make during the term of the Lease.

That is, it provides that Shaw's must repair the roof in order to ensure that it is weather

tight during the term of the Lease.

        The court looks to the location within the contract of these amended provisions in

order to interpret the intent of the parties with respect to the roof.  The second clause,

which modifies section 16.2, does not provide for replacement, while the language of

the CCA common area provisions in section 6.1 provides for replacement.  As stated,

the court interprets the purpose of the first clause to be to remove the roof from the

delineated list of items for which CCA is responsible for maintaining, repairing, and/or

replacing.  The court considers the inclusion of the word "replaced," in the first clause,

particularly given the phrase commencing with "Notwithstanding" in that clause, to

emphasize that CCA is no longer responsible for roof repair or replacement, as it was

prior to the Third Amendment.  Because the second clause, on the other hand, provides

only for repair to ensure that the roof is weather tight during the term of the Lease, the

lease's reference to "replaced as the same may be required," cannot reasonably be read to obligate Shaw's to furnish CCA with a fully new roof designed to ensure the long term life of the roof at the termination of the Lease.  The court interprets Shaw's obligation in section 6.1 to repair and/or replace the roof "as the same may be required" to provide that if the existing roof, as a result of Shaw's failure to properly repair it during the Lease, was beyond repair at the termination of the Lease, Shaw's would be obligated to furnish CCA with a fully new roof.  However, it is this court's conclusion that repair of the roof is a viable option, and therefore repairing the roof is sufficient to discharge Shaw's obligations under the Lease.

Shaw's is responsible for the cost of whatever repairs would have made the roof weather tight at the termination of the Lease, and for damage caused to the premises by roof leaks during the term of the Lease that resulted from Shaw's failure to maintain the roof in the weather tight state of repair required by the Lease.

> b.    Application of Law to Fact

Shaw's neglected to adequately repair the roof during the term of the Lease, leading to numerous leaks which resulted in damages to the premises.  Shaw's was obligated to maintain the roof in a water-tight state, which it failed to do.

Installing a new roof membrane system over the existing roof, as CCA desires, may be the best solution for long-term roof life, but Shaw's is not obligated to pay for the best solution for the roof.  Even if Shaw's was obligated to install an entirely new roof membrane system if it could not be repaired, the court finds that there is a reasonable repair alternative to restore the roof to a water-tight state.  The court finds that this obligation could be met by installing a liquid coating on the roof, engaging in

38

wire brushing and painting of equipment support frames, and replacing rain collars, and replacing insulation as necessary, for a cost of $125,000.  Because repair of the roof to make it weather-tight was Shaw's responsibility under the Lease, the court holds Shaw's liable for $125,000.

　　　　　　　2.　　　Interior Walls and Doors

The Lease provides that CCA will maintain the walls, though it does not make clear whether this obligation extends to interior walls.  Eugene Kagan testified that the intent of the parties was to refer to bearing walls, but acknowledged that the contract was written to provide for the landlord's responsibility for all walls.  The court need not resolve this dispute, however, because in the instant case, the damage to the interior walls was principally caused by mold and mildew, which itself resulted from various sources of water damage, including water coming through the roof.  To the extent damage to the interior walls was caused by Shaw's neglect of the roof, Shaw's is liable.

The court concludes that the sources of the interior moisture that caused the mold and mildew are attributable as follows: 5% from exterior walls, 20% from use of the facility as a supermarket, and 75% from water leaking through the roof.  The exterior walls were clearly the responsibility of CCA.  The use of the facility of the supermarket was proper under the Lease and thus any damage resulting from such use can be attributed to wear and tear.  Accordingly, Shaw's is liable for 75% of the cost of repairing mold and mildew damage on interior walls and doors.

In addition, the walls and doors exhibited physical damage independent of any mold or mildew resulting from wetness.  After twenty years of supermarket operation, one would expect damage to the wallboard and doors.  The court determines that 70%

39

of the physical damage is attributable to ordinary wear and tear, and 30% is attributable to water coming through the roof.

Notwithstanding the physical damage to the walls and doors, the court finds that the damage to the interior walls and doors was predominantly a result of the mold and mildew, and full replacement would not have been required in the absence of mold and mildew. The interior walls and doors required replacement at a combined cost of $31,000. Because it attributes the damage to the mold and mildew, the court will hold Shaw's liable for 75% of this amount, or a total of $23,250.

       3.     Ceiling

The ceiling was in poor condition at the time of Peterson's inspection in 2005. As Ferranti explained and Peterson acknowledged, however, Shaw's undertook to repair the ceiling at its own expense during and immediately following that inspection. At the time of Bombardier's inspection, the ceiling was in significantly better shape, with only about 5% of the tiles remaining damaged. These remaining tiles necessitated $3,000 worth of repair. Since Shaw's undertook a largely successful repair at the end of its Lease term, the court will not hold Shaw's responsible for installing an entirely new ceiling.

The court finds that the damaged ceiling resulted from the roof leaks, and thus Shaw's was responsible for the damage as of when it turned back the property on January 31, 2006. The court finds that, at the time of Gorham's inspection in 2007, the ceiling had again been damaged because the roof had continued to leak. However, CCA failed to mitigate its damages by repairing the roof after January 31, 2006, so that the leaks would not cause further damage to the premises. "The general rule with

40

respect to mitigation of damages is that a plaintiff may not recover for damages that were avoidable by the use of reasonable precautions on his part." Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 586 (1982).  Even though Shaw's failed to repair the roof in violation of its Lease, the court does not hold Shaw's responsible for damage caused by the failure to repair the roof that occurred after the termination of the Lease.

Therefore, the court will hold Shaw's liable for the $3,000 remaining cost of the ceiling repair at the time of Bombardier's inspection—the inspection that occurred closest to the date at which Shaw's turned back the property.

4.      Floor

The court has found that sections of the floor were in poor shape.  The damage was particularly significant in places where refrigeration/deli cases, grocery shelves, and cash registers had rested.  Some damage was attributable to fallen ceiling tiles that resided on certain areas of the floor and contributed to mold or mildew.  Still other damage could be attributable to water leaking through the rear masonry wall and pooling on the floor.

As is the case with the roof, the court finds that the Lease does not obligate Shaw's to supply CCA with a brand-new floor.  Instead, Shaw's obligation to repair damage caused by removal of trade fixtures, and its general repair obligation, makes it responsible for repairing damage it has caused.  Furthermore, the costs of reasonable wear and tear are excepted from the damage for which Shaw's must compensate CCA. Just as the sausage factory tenant in Codman was not liable for damage caused by "[d]ampness in the building and the presence of some water on the floors [that] were necessarily incident to the use of the building for the conduct of that business," 295

41

Mass. at 197, Shaw's, too, is not obligated to repair damage that would reasonably occur during the 20-year period that Shaw's operated a supermarket on the premises.

The court finds that the damage to the mezzanine area and quarry tiles resulted entirely from mold and mildew, and was sufficiently severe as to require the full replacement of tile in these areas, at a cost of $2,500 for each area.  The court finds that the source of mold and moisture for the mezzanine is entirely attributable to the roof, which was Shaw's responsibility.  The mezzanine was not exposed to supermarket operations that would have caused moisture, nor to any wall leaks.  The moisture contributing the mold and mildew on the quarry tiles, on the other hand, can be attributed as follows: 75% to the roof, 20% to supermarket operations, and 5% to the leaking walls.

Outside of the mezzanine and quarry tile areas, the bulk of the physical damage to the tile floor appears to have been from the siting of refrigeration/deli cases and grocery shelves, the use of which was proper and expected under the Lease.  Tiles were missing or loose under these areas.  The court credits the testimony that 70% of the physical damage to the floor was from wear and tear, while 30% was from roof leaks, and it finds that the missing and loose tile under the case work and shelves constitutes reasonable wear and tear.  Because Shaw's was responsible for yielding up the premises "broom clean," Shaw's is responsible for the cost of cleaning the dirty floor and the buildup of cleaner and wax residue.  Finally, the court has found that there was also significant mold and mildew damage to the floor, and the court has calculated Shaw's responsibility at 75% of the repair cost for that damage.

The court therefore holds Shaw's liable as follows.  Shaw's must pay $2,000 for cleaning the tile, $2,500 for the cost of repairing the mezzanine tile, and $1,875 for the cost of repairing quarry tiles (75% of $2,500).  As for the remaining damage to the floor ($41,550), the court finds that half of the damage ($20,775) is attributable to "physical" damage, for which Shaw's is 30% responsible ($6,233), while the other half ($20,775) is attributable to mold and mildew, for which Shaw's is 75% responsible ($15,581).  Therefore, Shaw's is liable for $28,189 for cleaning and repairing the floor.

5.      Exterior Windows and Doors

The court has found that every plate glass storefront window was broken.  The damage was a result of vandalism.  The Lease provided that the windows were the responsibility of Shaw's except where damage was due to the landlord's act or negligence.  While CCA's failure to provide security at the Plaza may have contributed to the windows becoming broken, the court concludes that Shaw's decision to keep the store empty without boarding up the windows was the most significant contributor to the windows being broken.  In addition, Shaw's was otherwise responsible for the plate glass windows under the Lease.  The court does not find that reasonable wear and tear would have included the breaking of the plate glass windows.  The cost of restoring and replacing the windows is $40,000, and the court attributes the full amount to Shaw's responsibility.

6.      Electrical, Mechanical, Plumbing, and HVAC

Because no evidence of the cost of repair of these items was introduced, the court finds that CCA has not proven any damages with respect to them.

E.    Damages Calculation on Breach of Contract Claim

Prior to considering any special defenses that Shaw's may have or Shaw's counterclaims, the court finds that the total amount of repairs for which Shaw's is liable is $219,439.  This amount takes account of reasonable wear and tear reflecting the use of the premises as a supermarket for a 20-year period.  Undertaking an overall evaluation of the propriety of the amount of damages, the court also finds that undertaking repairs costing this amount (plus CCA's share of the same repairs) is a "reasonable, practical or economical method of dealing with the property," Crystal Concrete, 309 Mass. at 470, and that an award of damages in this amount would not permit CCA to recover repair costs that "put [the] structure in a better condition than it was before the injury," Malden Mills, 303 B.R. at 698.  Finally, the court concludes that an award of damages in this amount adequately takes into account the "location and character of the demised premises,"  Crystal Concrete, 309 Mass. at 470.

IV.    **CONCLUSIONS OF LAW: AFFIRMATIVE DEFENSES**

Shaw's raises a host of affirmative defenses to CCA's claim for breach of contract.  Shaw's bears the burden of proof on these defenses.  Several of these defenses, including Shaw's claim that the damages are speculative, that others are responsible for them, or that they were the product of reasonable wear and tear, have already been addressed as part of the court's discussion of the damages for which Shaw's is responsible.  The court will address the remaining affirmative defenses in conjunction with its analysis of Shaw's counterclaim.

A.      Statute of Limitations on CCA's Breach of Contract Claim

The statute of limitations for a breach of contract claim in Massachusetts is 6 years.  Mass. Gen. Law. ch. 260, § 2.  Shaw's breach of the redelivery covenant is considered to have taken place on the date the Lease was terminated, January 31, 2006.  CCA filed its Complaint in this action in state court on February 28, 2006, and served Shaw's on March 2, 2006, well within the 6-year period.[11]  Therefore, Shaw's defense of the statute of limitations fails.

B.      Unclean Hands

Shaw's also attempts to interpose a defense of "unclean hands."  Because the doctrine of unclean hands applies when a party seeks equitable relief, and CCA seeks only legal relief in this action, the defense is rejected.

C.      Waiver and/or Estoppel

Shaw's has not articulated a theory under which CCA waived its right to collect damages under the Lease or should be estoped from doing so.  Waiver is the "intentional relinquishment of a known right."  Dynamic Mach. Works, Inc. v. Machine & Elec. Consultants, Inc., 444 Mass. 768, 771 (2005) (citations omitted).  Estoppel comes in two forms: equitable estoppel and promissory estoppel.  Loranger Const. Corp. v. E. F. Hauserman Co., 6 Mass. App. Ct. 152 (1978).  The doctrines differ "primarily in that equitable estoppel permits recovery only where there has been reliance upon the misrepresentation of past or present facts whereas recovery may be had under the theory of promissory estoppel where reliance has been placed upon statements of

---

[11]The action was removed to federal court on March 30, 2006.

future intent." Id. at 155 (citations omitted).  CCA has not, by its words or actions, waived its right to collect damages from Shaw's.  It brought this action against Shaw's promptly after the termination of the Lease, charging Shaw's failure to fully meets its obligations under the redelivery covenant.

The court also finds that CCA is not estopped from claiming damages from Shaw's.  The court has reduced the damages claimed by CCA on the bases that CCA cannot collect for "reasonable wear and tear" and that CCA bears partial responsibility for the damage caused to the premises.  Elsewhere, the court addresses, and rejects, Shaw's twin arguments that it was dispossessed from its leasehold by the Stop & Shop leases or that CCA wrongfully refused to sublet to Shaw's.  Shaw's remained obligated under the redelivery covenant in its Lease to return the premises to CCA in good repair, reasonable wear and tear excepted.  CCA did not induce Shaw's to act in any manner that Shaw's otherwise would not have needed to act or that somehow released Shaw's from its repair obligations.

D.    Failure to Mitigate Damages

The court agrees with CCA that a defense of failure to mitigate prior to the termination of the Lease might apply in an action for rent, but does not apply in an action to collect on a redelivery covenant.  Because the Lease was not terminated, CCA had no requirement to mitigate any damages prior to January 31, 2006.  See Fifty Assocs. v. Berger Dry Goods Co., 275 Mass. 509, 514 (1931).  The court has, however, concluded, supra, that it will not hold Shaw's liable for damage to the ceiling that occurred after January 31, 2006, because CCA had a duty to mitigate further damage after that date by repairing the roof.

46

**V.     CONCLUSIONS OF LAW: COUNTERCLAIMS**

In addition to its affirmative defenses, Shaw's also brings a multiple-count counterclaim against CCA.  The gravamen of these separately styled defenses and counterclaims is similar.  Shaw's argues that CCA, unbeknownst to Shaw's, substituted Stop & Shop as a tenant in the Country Club Plaza and that CCA unjustly collected "double rent" and common charges from both Shaw's and Stop & Shop.  Shaw's contends that as a result of CCA's actions, Shaw's is not liable for CCA's claimed damages for Shaw's failure to yield up the premises in adequate repair in 2006, that CCA is liable to Shaw's for the rent and other charges paid by Shaw's during the period when it was also collecting money from Stop & Shop in relation to the Shaw's space, and that CCA is liable to Shaw's in an additional amount because its behavior constituted fraud and a violation of the Connecticut Unfair Trade Practices Act.

   A.     Count One: Breach of Contract

      1.     Breach of Contract in Denying Shaw's Request to Sublease

Shaw's contends that CCA breached its contract by denying consent to Shaw's proposed sublease to a retail warehouse fulfillment center after Stop & Shop directed CCA to deny consent.  Shaw's Lease provides that CCA must consent to any proposed sublease of greater than 30% of the total space; the Lease does not restrict CCA's ability to withhold consent.  Under Massachusetts law, unless otherwise required by the Lease, a landlord need not act reasonably in withholding consent.  21 Merchants Row Corp. v. Merchants Row, Inc., 412 Mass. 204, 205-06 (1992).  Shaw's nevertheless contends that, because the facts demonstrate that CCA was willing to grant Shaw's permission to sublease the premises and refused to do so only because Stop & Shop

47

declined to grant Shaw's permission (exercising its rights under the contract between Stop & Shop and CCA), CCA did not exercise its contractual power in good faith.

The court finds that Shaw's arguments with respect to the proposed sublease are foreclosed by the Supreme Judicial Court's decision in 21 Merchants Row Corp. Because Massachusetts law permits CCA to act unreasonably in withholding consent to sublease, it could have done so for any reason or no reason at all.  In the agreement between CCA and Shaw's, CCA effectively reserved to itself the right to unilaterally and unreasonably withhold consent to sublease.  Shaw's therefore took the risk that CCA might make the decision to withhold permission to sublease in reliance upon its obligations to a third party, such as another tenant at the Country Club Plaza.  CCA acted within its rights under the contract, and therefore the court cannot conclude that the denial of Shaw's request to sublease constituted a breach of contract.

2.      Breach of Contract / Covenant of Good Faith and Fair Dealing

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract, including those between "sophisticated businesspeople."  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 473 (1991).  The covenant ensures "that neither party interferes with the ability of the other to enjoy the fruits of the contract, and that, when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract."  Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007) (internal citations and quotation marks omitted).

The covenant may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship . . . ."  Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).  However, breaching the

covenant does not require breaching an express term of the contract.  Speakman v. Allmerica Financial Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance."  Id. (citations omitted).  If a party exercises a contractual power in bad faith—that is, if it exercises its power in a manner that fails to comport "with the parties' reasonable expectations as to performance"—that exercise may qualify as a breach of the covenant of good faith and fair dealing.  See Anthony's Pier Four, 411 Mass. at 471-73; Speakman, 367 F. Supp. 2d at 132.

Shaw's contends that CCA breached its contract, including the covenant of good faith and fair dealing, in three respects.  First, Shaw's contends that, because CCA gave Stop & Shop the power to cause CCA to terminate the Shaw's Lease if Shaw's ever sought to reopen a store, CCA deprived Shaw's of its right under the Lease to use the property as a supermarket.  In support, Shaw's points to the clause in the Stop & Shop leases permitting Stop & Shop to direct that CCA exercise its "go dark" authority to terminate the Shaw's Lease.  Second, Shaw's contends that CCA breached Shaw's exclusive rights under the Lease to operate a grocery store at the premises by giving Stop & Shop the exclusive right, under its leases, to operate a supermarket in the Plaza—including in the Lease for the 18,250 square foot space—while Shaw's also possessed that right.  Third, Shaw's contends that charging Shaw's for common charges without disclosing that Stop & Shop was also paying for the same items was contrary to Shaw's reasonable expectations under the Lease.

49

> a.   Giving Stop & Shop control over how CCA acted with regard to the Shaw's space did not deprive Shaw's of its right to operate a supermarket at the premises

The court is not persuaded that Shaw's was deprived of its right under the Lease to use the property as a supermarket by CCA giving Stop & Shop the power to direct its decision-making as to CCA's rights with regard to Shaw's space.  Shaw's never reopened a supermarket in the space, nor did Shaw's make even preliminary plans to do so.  Shaw's could have chosen to reopen at any time.  Even if CCA had notified Shaw's of its intent to invoke the lease's "go dark" provisions to terminate the Lease, Shaw's would then have had thirty days in which to reopen a supermarket and thereby prevent the termination from taking effect.  Had Shaw's chosen to reopen a supermarket, it is possible, indeed likely, that Stop & Shop would have sought to exercise its right under its Lease to have CCA invoke the "go dark" provision in the Shaw's Lease.  But CCA would not have succeeded in doing so unless Shaw's was unable to open a supermarket within thirty days.  Furthermore, CCA never invoked the "go dark" provision at Stop & Shop's behest or otherwise.  Because Shaw's never sought to reopen a supermarket, it was never denied the benefit of its bargain.  The court cannot conclude, based solely on CCA's entering into agreements with Stop & Shop in which it pledged to exercise its rights under the Shaw's Lease in a manner consistent with Stop & Shop's interest, that CCA breached the covenant of good faith and fair dealing in the Shaw's Lease.

    b. CCA violated Shaw's exclusive rights under the Lease to operate a grocery store at the premises by giving Stop & Shop the same right

As to the second argument, on the other hand, the court concludes that CCA breached the Shaw's Lease.  In the Shaw's Lease, CCA warranted that the premises could be used for the sale of food and groceries.  Shaw's Lease at 9.1.  CCA also agreed that, "it shall not lease or permit the use or occupation of any other portions of the Center for the operation of a business, the Principal Purpose (as defined herein) of which is the sale of food for off-premises consumption and groceries."  Shaw's Lease at 15.1.  The Stop & Shop Lease for the 18,250 square foot space, which took effect on February 1, 2000, provided that:

> The Demised Premises may be used for any lawful purpose, provided that . . . the Demised Premises shall not be used for any purpose which violates any exclusive use provision contained in a lease for other premises in the Shopping Center in effect on the date of this Lease as set forth on Exhibit D attached hereto . . . . Notwithstanding the foregoing, nothing contained herein shall limit or prohibit the operation of a food supermarket, superstore or combination food/drug store/general merchandise business in the Demised Premises . . . .

Stop & Shop Master Lease II, section 7.1.  The Stop & Shop Lease purported to list restrictive covenants in CCA's leases with other tenants in Exhibit D, and permitted uses in CCA's leases with other tenants in Exhibit E-1.  Neither exhibit mentions Shaw's Lease or its own permitted uses.  Nor does the First Amendment to Master Lease II amend section 7.1 or exhibits D or E-1 to reference the Shaw's Lease and Shaw's permitted use.

Because Shaw's remained a tenant after Master Lease II went into effect, CCA was in breach of the Shaw's Lease.  CCA explicitly agreed not only that it would not permit the use or occupation of the premises for the operation of a grocery business,

but also that it would not <u>lease</u> any other portion of the center for the operation of a grocery business. Therefore, even though Stop & Shop never opened a supermarket in the 18,250 square foot space, the execution of Stop & Shop Master Lease II itself constituted a breach of the Shaw's Lease.

Shaw's has not, however, proven any damages resulting from the breach of its exclusive right to operate a grocery store at the Plaza.  Because Shaw's never sought to reopen a supermarket, it suffered no damages resulting directly from CCA's undermining of its exclusive right to do so.  Further, Stop & Shop never sought to open a supermarket in the 18,250 square foot portion of the center.  Therefore, the court does not award damages for breach of Shaw's exclusive right under the Lease to operate a grocery store at the premises.

> c.  CCA breached the Shaw's Lease by double-billing Shaw's and Stop & Shop for common charges

The court finds Shaw's third basis persuasive.  Common charges were amounts charged by third parties to CCA for services provided to Plaza tenants in common and from which they all benefitted.  These included snow removal, lighting repair, parking lot repairs, other maintenance, taxes, and insurance.  Under the Shaw's Lease, a pro rata share of common charges was to be passed through to each tenant based on the proportion of the complex that it occupied.[12]  The pro rata share was defined in the Shaw's Lease as the "proportion that the first floor area of the Premises bears to the

---

[12]The Lease provided for Shaw's to pay 115% of its pro rata share of the CAM charges, and 100% of the taxes and insurance.  The additional 15% was added as an Administrative Fee on the bills sent to Shaw's.  The presence of this additional 15% does not change the analysis, because it was considered part of the total common charges paid by Shaw's, of which 50% was remitted back to Stop & Shop.  Stop & Shop, however, was required to pay 110% of its pro rata share of the CAM charges, not 115%.

total first floor area of all buildings in the Center."  Shaw's Lease, section 6.2.  Shaw's

prepaid the expected amount of charges, and under the Lease, charges were

reconciled with the actual billed amounts at the end of each year.[13]  Because these

charges covered expenses paid by CCA that were reimbursed by the tenants on a pro

rata basis, Shaw's had the right to assume that CCA would bill it only for its pro rata

share of the charges, and that CCA would credit Shaw's for any overpayments that

resulted in CCA being overpaid for the common charges attributable to the 40,000

square foot space.  However, CCA double-billed Shaw's and Stop & Shop for the

proportion of the common charges attributable to the 40,000 square foot space.  See

First Amendment to Master Lease I, section 3.3; Exs. 163, 164, 169, 173, 174, 179,

180, 192, 193, 203, 204, 217.  CCA was over-reimbursed, at Shaw's expense, for the

portion of the common charges attributable to the 40,000 square foot space.

 Further, the Shaw's Lease provides explicitly for a reconciliation, in Shaw's favor,

with the charges paid by other tenants.  The Lease reads:

> To the extent . . . Landlord is reimbursed for any Common Charge by any other
> tenant in the Center in excess of such other tenant's Pro Rata Share (as defined
> above) of such Common Charge plus the fifteen (15%) percent surcharge
> payable by such other tenant, then . . . such payment by such other tenant in the
> Center in excess of such other tenant's Pro Rata Share of such Common
> Charge plus the fifteen (15%) percent surcharge payable by such other tenant
> shall be excluded from the Common Charges billed to the Tenant herein.

Shaw's Lease, section 6.4 (as amended).  From February 1, 2000 to January 31, 2006,

Stop & Shop was a tenant only in the 18,250 square foot space; as CCA has insisted

---

[13]The Shaw's Lease provides for a semi-annual reconciliation.  Shaw's Lease, sections 6.4 and
6.5.  In practice, however, the reconciliation appears to have taken place annually, shortly after the end of
each calendar year.  See, e.g., Exs. 164, 173, 178, 192, 203, 216.

throughout this litigation, Stop & Shop did not become a tenant in the 40,000 square foot space until February 1, 2006.  Stop & Shop nevertheless paid a combined common charge covering the pro rata share attributable to both spaces.

Sections 6.2 and 6.4 of the Shaw's Lease express the parties' intent that Shaw's would be liable in the first instance for a pro rata share of actual common charges incurred, but that to the extent CCA received reimbursement from another tenant in the Plaza that, in effect, covered a portion of the common charges attributable to the Shaw's premises, then Shaw's would be entitled to reimbursement of that amount.

CCA offset any payments due by Stop & Shop with one-half of the payments received from Shaw's.  See Ex. 170.  After netting these payments, CCA retained 152.5% of the base CAM charges, and 150% of the taxes and insurance, covering the 40,000 square foot space to which it was entitled from February 1, 2000, through January 31, 2006.  Because CCA had no right to "double-bill" Shaw's for a share of common charges that were also being reimbursed by Stop & Shop, and because the Lease explicitly provides for any such excess amounts to be refunded to Shaw's, Shaw's is entitled to recover one-half of the common charges that it paid during that period, less one-half of 5% of the administrative fee paid on base CAM charges.  The court has found that Shaw's paid $827,330.46 in common charges during this period, of which $361,876.67 was CAM charges including the 15% administrative fee.  The base amount of CAM charges paid by Shaw's was therefore $314,675.37 ($361,876.67 / 1.15), and 5% of the administrative fee on those charges was therefore $15,733.77. Shaw's is entitled to recover one-half of the total common charges paid ($413,665.23), less one-half of 5% of the CAM charges paid ($7,866.89), for a total of $405,798.34.

54

B.       Count Two: Unjust Enrichment

"Unjust enrichment is defined as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005) (citation omitted).  Under Massachusetts law, "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other."  Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 589 (1996) (quoting Restatement of Restitution § 1 (1937)). However, "[a]n equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law."  Santagate, 64 Mass. App. Ct. at 329 (citation omitted).

The court has concluded that CCA breached its contract by retaining excess common charges without crediting these charges back to Shaw's and has permitted Shaw's to recover that amount. The court has found that Shaw's has an adequate remedy at law to address its claim that CCA substituted Stop & Shop as a tenant and unjustly collected "double rent" and other charges.  Specifically, Shaw's may sue, as it has, for breach of contract and breach of the covenant of good faith and fair dealing, as well as CUTPA.

Shaw's further seeks to obtain the other half of the common charges and all the rent paid from February 1, 2000 through January 31, 2006.  The court has already concluded that Shaw's Lease was not terminated until January 31, 2006.  Under the Shaw's Lease, CCA was entitled to collect rent and a pro rata share of the common charges, less any excess common charges paid by another tenant to CCA, through the termination date.  Because CCA was entitled to collect these amounts from Shaw's, it was not unjustly enriched by doing so, and the court therefore declines to grant Shaw's

55

any further restitution of amounts properly paid under its Lease.

    C.    Count Three: Declaratory Judgment

Shaw's seeks a declaratory judgment that its Lease was terminated as of

January 31, 2000, and that all liabilities to CCA were relinquished as of that date.  The

court has already concluded that the Lease was terminated on January 31, 2006, and

thus rejects Shaw's application seeking to have it declare otherwise.

    D.    Count Four: Fraud

Shaw's bases its fraud claim on a failure to disclose.  In Massachusetts, a

defendant may be held liable for fraudulent nondisclosure of known facts when there

exists a duty to disclose the facts, the defendant failed to disclose the facts with the

intention that the plaintiff should act thereon, the plaintiff did so act, and the plaintiff

suffered damages as a result.  See Alpine v. Friend Bros., 244 Mass. 164, 167 (1923).

In addition, Massachusetts requires that the reliance be reasonable as a matter of law.

See Kennedy v. Josephthal & Co., Inc., 814 F.2d 798, 805 (1st Cir. 1987) (citing Saxon

Theatre Corp. v. Sage, 347 Mass. 662, 666-67 (1964)).  Finally, Massachusetts cases

have recognized that one who "chooses to make a disclosure shoulders certain

responsibilities of completeness and accuracy."  See Royal Business Group, Inc. v.

Realist, Inc., 933 F.2d 1056, 1065 (1st Cir. 1991) (citing Metropolitan Life Ins. Co. v.

Ditmore, 729 F.2d 1, 5 (1st Cir. 1984)); Kannavos v. Annino, 356 Mass. 42, 46-48

(1969)).  As one case explains:

> Although there may be no duty imposed upon one party to a transaction to speak
> for the information of the other, if he does speak with reference to a given point
> of information, voluntarily or at the other's request, he is bound to speak honestly
> and to divulge all the material facts bearing upon the point that lie within his
> knowledge. Fragmentary information may be as misleading as active

misrepresentation, and half-truths may be as actionable as whole lies. Kannavos, 356 Mass. at 48 (citations and internal quotation marks omitted).

Shaw's has demonstrated that CCA made incomplete disclosures to Shaw's with regard to Shaw's share of the common charges, and that the failure to disclose was fraudulent.  In particular, CCA failed to recalculate Shaw's share of the common charges once it began receiving common charges from Stop & Shop covering the 40,000 square foot space.  Although, as CCA points out, Shaw's remained a tenant and remained obligated for its pro rata share of common charges, that share was effectively altered by Stop & Shop's payment of common charges as explained in the court's analysis of the breach of contract claim.  Shaw's relied on the accuracy of the bills and reconciliation statements sent to it by CCA, and acted to its detriment by sending CCA a greater share of the common charges than it was responsible to pay under its contract.  Because the contract contemplated that CCA would calculate and bill Shaw's for its share of the common charges, and Shaw's had no direct knowledge of the underlying information supporting those charges, it was reasonable for Shaw's to rely on CCA's bills in determining the amount to pay.  CCA's actions were deliberately designed to conceal from Shaw's that Stop & Shop was also paying common charges with regard to the 40,000 square foot space.  Accordingly, Shaw's has satisfied the elements of its fraud claim with regard to CCA's failure to disclose Shaw's correct share of the common charges.

Shaw's also contends that CCA committed fraud by failing to disclose the Stop & Shop Lease itself and that Stop & Shop was also paying "rent" on the 40,000 square foot space.  The court has already held that the execution of the Stop & Shop Lease did

not have the effect of terminating the Shaw's Lease, nor did the existence of that Lease affect Shaw's possessory rights under its Lease.  Accordingly, CCA did not commit fraud by failing to disclose the Shaw's Lease.

With regard to CCA's double-billing of common charges, the court awards Shaw's $405,798.34 for prevailing on its fraud counterclaim (Count Four), the same damages awarded for the breach of contract counterclaim.

### E.     Count Five: Connecticut Unfair Trade Practices Act

Shaw's also seeks relief under the Connecticut Unfair Trade Practices Act (CUTPA).  The Act provides that, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  It defines "trade" and "commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."  Conn. Gen. Stat. § 42-110a(4).  CCA contends that, because the subject of Shaw's claim is a lease of a property located in Massachusetts, the requirement that the trade or commerce occur "in this state" bars Shaw's claim.  Shaw's counters that, because CCA invoiced Shaw's from Connecticut, CCA's property manager was located in Connecticut, and Shaw's paid CCA by sending rent and other charges to Connecticut, that CUTPA applies to the claim.

CUTPA regulates unfair competition and unfair or deceptive acts or practices taking place in Connecticut.  Courts have accordingly held that conduct with a mere tenuous link to Connecticut is not actionable under CUTPA.  See, e.g., Omega S.A. v.

58

Omega Eng'g, Inc., 2005 WL 3307277, at *9 (D. Conn. Dec. 6, 2005) (foreign trademark filings generated by a Connecticut corporation, not tied to trade or commerce associated with Connecticut, do not qualify).  "A CUTPA violation, however, need not necessarily occur in Connecticut, but instead, the violation must 'be tied to a form of trade or commerce intimately associated with Connecticut.'"  Titan Sports, Inc. v. Turner Broadcasting Systems, Inc., 981 F. Supp. 65, 71 (D. Conn. 1997) (citations omitted). Courts have found that behavior that originates out of state but that has effects in Connecticut, or that originates in Connecticut but has its primary effects out of state, may qualify.  See, e.g., Titan Sports, Inc., 981 F. Supp. at 72 (finding plaintiffs stated a CUTPA claim where allegedly deceptive television programs that originated in Georgia "air in Connecticut, their pay-per-views are broadcast in Connecticut, Connecticut residents call the 900-number hot line and Plaintiff has its principal place of business in Connecticut"); Richmond Fredericksburg & Potomac R.R. Corp. v. Aetna Cas. & Sur. Co., 1997 WL 205783, at *2 (D. Conn. Apr. 11, 1997) (finding that Virginia-based plaintiffs stated a CUTPA claim where their Connecticut-based insurers refused to pay for, investigate, or attempt to settle plaintiffs' alleged environmental liabilities in Virginia).  The court finds that, because the allegedly deceptive actions were undertaken by a partnership based in Connecticut, involved leases prepared in and sent from Connecticut, and involved the transmission of money to Connecticut, there is a sufficient Connecticut nexus to bring a CUTPA claim.

The Act provides that, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b.  "A violation of CUTPA may be established by showing

either an actual deceptive practice or a practice amounting to a violation of public policy." Willow Springs Condominium Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 43 (1998) (citations and internal quotation marks omitted).   "The standard under CUTPA is lower than for fraud and requires no showing of an intent to deceive." Id. at 44.  "Although a failure to disclose can constitute a CUTPA violation, it will do so 'only if, in light of all the circumstances, there is a duty to disclose.'" Id. at 43-44 (quoting Normand Josef Enterprises, Inc. v. Connecticut National Bank, 230 Conn. 486, 523 (1994)).

The court has already concluded, in its analysis of Shaw's fraud claim, that CCA failed to disclose matters that it had a duty to disclose.  The court accordingly finds that CCA has violated CUTPA by deliberately concealing that Stop & Shop was also paying common charges on the 40,000 square foot space in order to avoid having to comply with its contractual obligation to reconcile the charges and refund excess monies collected to Shaw's.

CUTPA provides for actual damages, punitive damages in the court's discretion, equitable relief the court deems necessary or proper, costs, and attorneys fees.  See Conn. Gen. Stat. 42-110g.  The court finds that the failures to disclose took place as of the dates CCA sent the reconciliation statements to Shaw's.  The court concludes based on the statute of limitations, infra, that Shaw's recovery under CUTPA is limited to damages covering the reconciliation statements of January 12, 2005 (2004 reconciliation) and January 9, 2006 (2005 reconciliation).

The parties have stipulated to a total amount paid over the six year period, from which the court has deduced the amount paid for common charges—$827,330.46.

60

However, the parties have not stipulated to the specific amounts applicable for CAM, taxes, and insurance during each of those years.  The court has reviewed the reconciliation statements submitted.  As best as it can determine, the total amount that Shaw's paid for CAM over the February 1, 2000 to January 31, 2006 period amounted to $361,876.67—including $64,091.28 for 2004 and $100,231.70 for 2005.  See Exs. 163, 173, 178, 192, 203, 217.  That leaves $465,453.79 for taxes and insurance. Shaw's was billed $4,133.87 monthly for taxes in 2005 for a total of $49,606.44, see Ex. 203, and $4,506.39 monthly for taxes in 2004 for a total of $54,076.68, see Ex. 192. The court determines that these are the amounts paid for taxes in 2004 and 2005. While the parties have not submitted evidence of the breakdown of the insurance costs paid by Shaw's in 2004 and 2005, the exhibits indicate that Shaw's pro rata insurance cost for 2002 was approximately $13,369.35, see Ex. 190 (indicating a total insurance cost of $56,292 for the center, multiplied by Shaw's 23.75% ordinary billed share), and for 2003 was $16,130, see Ex. 195.  Because Shaw's has not introduced evidence that it paid a higher amount for insurance in subsequent years, the court determines that the insurance rate for 2004 and 2005 was also $16,130 each year.

The total amount of common charges paid by Shaw's for 2004, as of the January 12, 2005 statement, was $134,297.96.  The total amount of common charges paid by Shaw's for 2005, as of the January 9, 2006 statement (as amended March 6, 2006, see Ex. 217), was $165,968.14.  Of these amounts, the court determines that one-half of the total, less one-half of 5% of the base CAM charges, was wrongfully collected in violation of CUTPA.  The 5% of the base 2004 CAM charges was $2,786.58 (($64,091.28 / 1.15) X .05); one-half of this amount is $1393.29.  The 5% of the base

61

2005 CAM charges was $4,357.90 (($100,231.70 / 1.15) X .05); one-half of this amount is $2,178.95.  On Count Five, the court therefore awards Shaw's $65,755.69 ($67,148.98 less $1,393.29) for the January 12, 2005 statement, and $80,805.12 ($82,984.07 less $2,178.95) for the January 9, 2006 statement.  These amounts are awarded as "actual damages," and are coextensive with the amount the court has already awarded Shaw's on other claims.  The court does not deem any equitable relief to be necessary or proper in this case.

    An award of punitive damages under CUTPA is at the court's discretion.  Conn. Gen. Stat. § 42-110g(a); Gargano v. Heyman, 203 Conn. 616, 622 (1987).  To award punitive damages, the evidence "must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights."  Gargano, 203 Conn. at 622 (citations and internal quotation marks omitted).  The court concludes that CCA's fraudulent actions and deceptive practices in this case are sufficiently egregious to warrant an award of punitive damages.  Because it had few independent means of verification, Shaw's had little choice but to rely on CCA's representations as to whether it was being appropriately billed for common charges.  Instead of dealing honestly and forthrightly with its tenant, however, CCA conspired with its tenant's competitor to, in effect, kick back to the competitor a significant portion of the rent and common charges its tenant paid for use of the space.  It did so in exchange for an even greater payment of "key money" by that competitor.  Further, CCA and Stop & Shop went to lengths to hide the arrangement, including entering into a non-disclosure agreement, creating an LLC to which the Stop & Shop Lease could be assigned, and recording a notice of lease that failed to disclose that Stop & Shop was already paying common charges on

the 40,000 square foot space.  While reversionary leases are an acceptable means for a tenant to reserve space that will become available in the future, the sort of double-billing for common charges during the pendency of the initial tenant's lease in which CCA engaged constitutes an intentional violation of Shaw's rights.  Accordingly, the court awards punitive damages in an amount equal to the amount of compensatory damages awarded on Shaw's CUTPA claim—$146,560.81.

The court will separately address the issue of the statute of limitations, and costs and attorney's fees, infra.

        F.    Statute of Limitations on Counterclaims

Shaw's brings both tort and contract claims.  As the court has already stated, the statute of limitations on contract claims is six years.  The statute of limitations on the fraud and CUTPA claims is three years.  The court concludes that Shaw's contract and fraud counterclaims are not barred by the statute of limitations, but that Shaw's may only recover on its CUTPA claim with regard to conduct occurring within the three years immediately preceding the filing of its counterclaim.

The court first addresses the contract claims.  In Massachusetts, "[a] cause of action for breach of contract accrues at the time of the breach."  International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. 215, 221 (1990) (citations omitted).  As the Massachusetts Appellate Court has explained:

> This rule applies even though a specific amount of damages is unascertainable at the time of the breach or even if damages may not be sustained until a later time. . . . There are, however, situations in which a cause of action for breach of contract is not capable of being discovered because it is based on an 'inherently unknowable' wrong.  In those cases, the 'discovery rule' tolls the accrual date of the statutory period until the injured party knows or should know the facts giving rise to the cause of action.

63

Id. (citations omitted).  Under Massachusetts law, the statute of limitations on counterclaims is computed as if the counterclaim was commenced on the same date as the plaintiffs' action.  See Mass. Gen. Laws ch. 260, § 36.  This action was filed on February 28, 2006, and served on March 2, 2006.  Shaw's did not become aware of the facts giving rise to its counterclaim—the provisions of an agreement into which CCA and Stop & Shop entered—until after the commencement of this action in 2006.[14]  CCA and Stop & Shop took steps to conceal their actions by entering into a non-disclosure agreement, and CCA's representative Tamara Kagan Levine testified that, in her interactions with Shaw's representatives, she never made Shaw's aware of Stop & Shop's involvement.

CCA also claims that Shaw's received notice by virtue of the recording of a Notice of Lease with regard to the Stop & Shop Lease of the 40,000 square foot space. As Shaw's correctly points out, however, the Notice of Lease was recorded long after Shaw's Lease had begun.  Under Massachusetts law, prior interest holders are not considered to have constructive notice of subsequently recorded instruments, and consequently a tenant is under no duty to constantly search the Registry of Deeds for notices recorded during the term of its Lease.  See, e.g., Strong v. Stoneham Co-Operative Bank, 2 Mass. App. Ct. 828, 829 (1974) (providing that recording of junior mortgages does not constitute constructive notice of their existence to prior mortgagees); see also Hardy v. Beverly Sav. Bank, 175 Mass. 112, 113-14 (1900)

_____

[14]CCA argues that an email exchange between Shaw's representatives in 2004 makes clear that Shaw's was aware that Stop & Shop had a Lease covering space in the Country Club Plaza.  The court credits the testimony of Kerrigan McKay that the relevant personnel at Shaw's had no awareness that Stop & Shop had any type of Lease covering the 40,000 square foot Shaw's space.

(reasoning that the subsequent recording of a mortgage does not provide constructive notice to a prior mortgagee). The purpose of the Anglo-American system of land records, including the Massachusetts Registry of Deeds, is to inform subsequent interest-takers of prior existing interests to which they might be subject, and also to provide for clear ascertainment of the priority of interests. See Lamson & Co. v. Abrams, 305 Mass. 238, 244 (1940). Because Shaw's had a 25-year lease through January 31, 2006, once it searched the Registry at the start of its lease term and verified that no superior interests prevented it from taking possession, no subsequently recorded document to which it was not a party could have legally affected Shaw's rights under the Lease.

Further, as Shaw's points out, the Notice of Lease did not disclose the terms of the Lease, Stop & Shop's involvement, or the actual commencement date of the Lease. The Massachusetts recording statute provides that a notice of lease:

> shall contain the following information with reference to such lease:--the date of execution thereof and a description, in the form contained in such lease, of the premises demised, and the term of such lease, with the date of commencement of such term and all rights of extension or renewal.

Mass. Gen. Laws ch. 183, § 4 (emphasis added). The notice did not include a specific date of commencement. The notice correctly suggested that the Lease was reversionary by noting that once the commencement date occurred, a new document would be filed in the Registry, thus implying that the commencement date had not yet occurred because no such document was filed. However, because the notice did not reveal that Stop & Shop's obligation to pay common charges on the 40,000 square foot space had in fact commenced on February 1, 2000, even a full awareness of the terms

65

of the notice could not have made Shaw's aware of the facts underlying the ultimately successful portion of its counterclaim.

Because of Shaw's actual unawareness and the steps CCA and Stop & Shop took to conceal their actions, CCA's breach qualifies as "inherently unknowable" and thus the statute of limitations did not begin to run until after Shaw's discovery of the facts of CCA's agreement with Stop & Shop.  Shaw's therefore timely filed its contract counterclaim, as it did so well within six years of discovering the facts giving rise to the cause of action.

Similarly, Shaw's fraud claim was timely filed.  Massachusetts law provides that a cause of action for misrepresentation does not accrue until the plaintiff learns or reasonably should have learned of the misrepresentation.  McEneaney v. Chestnut Hill Realty Corp., 38 Mass. App. Ct. 573, 576-77 (1995) (citation omitted).  CCA entered into an agreement with Stop & Shop to conceal the existence of the Master Leases from Shaw's and repeatedly failed to disclose to Shaw's (or to refund to Shaw's) the excess common charges that it collected for the 40,000 square foot space.  Nor, for reasons already stated, was Shaw's on constructive notice of the misrepresentation. See also Charbonneau v. Rokicki, 278 Mass. 524, 526-27 (1932) (holding that the presence of accurate information in the Registry of Deeds does not relieve a defendant-seller of liability for fraud when the plaintiff-buyer justifiably relies on the defendant-seller's misrepresentations).  Because CCA deliberately prevented Shaw's from learning that CCA had breached its contract and committed fraud, and Shaw's did not learn nor should it reasonably have learned of the misrepresentation before 2006, CCA may not take advantage of the statute of limitations to bar Shaw's claim.

As to the CUPTA claims, CUTPA provides that, "An action under this section may not be brought more than three years after the occurrence of a violation under this chapter."  Conn. Gen. Stat. § 42-110g(f).  CUTPA's statute of limitations is not tolled as to fraudulent conduct that occurred more than three years before the filing of the action. See Willow Springs, 245 Conn. at 45-46.  In situations involving a continuing course of conduct—that is, when conduct in violation of CUTPA both predates and falls within the limitations period—damages may be recovered only for violations occurring within the limitations period.  See City of West Haven v. Commercial Union Ins. Co., 894 F.2d 540, 546 (2d Cir. 1990).  Under Connecticut law, with the exception of tort actions brought for negligence, reckless or wanton misconduct, or malpractice, the statute of limitations on counterclaims runs from the date of the filing of the counterclaim.  See Conn. Gen. Stat. § 52-584 (providing that a counterclaim filed in certain tort actions is considered timely filed if the plaintiff's action is timely filed); Conn. Gen. Stat. § 42-110g(f) (containing no such provision for CUTPA actions); see, e.g., McKosky v. Plastech Corp., No. 426036, 2001 WL 761147 (Conn. Super. June 13, 2001).  In this case, CCA's conduct charged to be a violation of CUTPA occurred annually each January from 2001 through 2006, when CCA deliberately failed to correctly reconcile Shaw's overpayment of common charges.  Shaw's moved for leave to file its counterclaim on October 9, 2007, and the counterclaim was docketed on November 21, 2007.  Therefore, Shaw's claim is timely as to CCA's violations on January 12, 2005 and January 9, 2006, but it may not collect damages pursuant to CUTPA for earlier violations.

VI.     **OTHER DAMAGES**

A.     Prejudgment Interest

In diversity cases, an award of prejudgment interest is a substantive aspect of

the remedy.  Therefore, the district court first looks to the substantive law of

Connecticut, including Connecticut's choice of law principles, to determine which law to

apply.  As the Second Circuit pointed out in Valley Juice Ltd., Inc. v. Evian Waters of

France, Inc.,

> Connecticut follows the Restatement's approach with respect to prejudgment
> interest, and applies [t]he local law of the state selected by [applicable choice of
> law principles to] determine[ ] whether plaintiff can recover interest, and, if so, the
> rate, upon damages awarded him for the period between breach of contract and
> the rendition of judgment.

87 F.3d 604, 614 (2d Cir. 1996) (citations and internal quotation marks omitted).  The

court has already determined that Massachusetts law applies to the substantive claims

in the case except for the CUTPA claim, to which Connecticut law applies.  Therefore,

Massachusetts law with regard to prejudgment interest will apply on all claims except

the CUTPA claim, and Connecticut law on prejudgment interest will apply to the CUTPA

claim.

On contract claims, Massachusetts law provides for a rate of 12% simple interest

calculated from the date of the breach when that date has been established.  Mass.

Gen. Laws ch. 231, § 6C.  Otherwise, interest is computed from the date of the

commencement of the action.  Id.  In this case, multiple breaches of contract took

place.  Shaw's breach is considered to have taken place on January 31, 2006, the date

that Shaw's failed to redeliver the premises in the specified condition.  At the very least,

CCA's breaches took place each time it failed to reconcile common charges in

68

accordance with the requirements of section 6.4 of the Shaw's Lease.  "Where no demand is made and multiple breaches occur, however, interest must accrue 'from the date of the commencement of the action.'"  Peabody N.E., Inc. v. Town of Marshfield, 426 Mass. 436, 445-46 (1998) (concluding that where breaches occurred by multiple parties on multiple dates, even where all dates were ascertainable, prejudgment interest would accrue from the date the action was commenced).  Therefore, the court will compute prejudgment interest from the date this action was originally filed in state court, or February 28, 2006.  Cf. Phoenix Ins. Co. v. Pechner, 95 U.S. 183, 185 (1877) (construing date of commencement of a removed action to be the date the action was originally filed in state court).

On tort claims, Massachusetts law provides for a rate of 12% simple interest calculated from the date of the commencement of the action.  Mass. Gen. Laws ch. 231, § 6B.  As to the CUTPA claim, CUTPA does not expressly provide for prejudgment interest.  See Nielsen v. Wisniewski, 32 Conn. App. 133, 140 (1993).  Prejudgment interest may, however, be awarded on CUTPA claims that satisfy the requirements of Connecticut's general prejudgment interest statute, Conn. Gen. Stat. § 37-3a.  That statute provides, in pertinent part, as follows: "[I]nterest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable."  Conn. Gen. Stat. § 37-3a(a).  In determining whether prejudgment interest should be awarded, the Connecticut Supreme Court has stated that, "Whether a sum in certain circumstances has been liquidated may, of course, be a useful although not necessarily controlling criterion."  Bertozzi v. McCarthy, 164 Conn. 463, 467 (1973).  In this case, CCA wrongfully

detained the common charges that Shaw's had overpaid, starting on the dates of the two reconciliations at issue in the CUTPA claim, January 12, 2005 and January 9, 2006. See Exs. 203, 216.  Therefore, Shaw's is entitled to prejudgment interest, at a rate of 10%, from the date of those reconciliations through the date of judgment.  (It is not entitled to an award of prejudgment interest on its claim for punitive damages, because such damages are discretionary and thus cannot be for a sum certain).  This award of prejudgment interest partially overlaps with the award of 12% simple interest on the breach of contract and fraud counterclaims, which runs from the date of the commencement of the action.

Accordingly, the court awards CCA prejudgment interest as follows:[15]

From February 28, 2006 through judgment: 12% annually on $219,439.00

For a total award of: $85,491.03.

The court awards Shaw's prejudgment interest as follows:

From February 28, 2006 through judgment: 12% annually on $405,798.34

From January 12, 2005 through judgment: 10% annually on $65,755.69,

of which amounts covering the time period from February 28, 2006

through judgment are coextensive with the above award

From January 9, 2006 through judgment: 10% annually on $80,805.12

of which amounts covering the time period from February 28, 2006

through judgment are coextensive with the above award

For a total award of: $166,704.11.

---

[15]Interest has been computed using a 365-day year.

70

B.    Attorney's Fees

The court must address the issue of attorney's fees.  The "American Rule,"
which generally governs the payment of attorneys' fees in litigation in the United States,
provides that each party to a case pays its own legal fees.  However, this rule may be
varied by statute or contract.

CCA claims attorneys fees on the basis of section 8.1.9 of the Shaw's Lease,
which provides for Tenant's redelivery obligations and adds in pertinent part:

> Tenant shall further indemnify Landlord against all loss, cost and damage
> resulting from Tenant's failure and delay in surrendering the Premises as above
> provided.

Shaw's Lease, section 8.1.9.

Shaw's seeks attorneys fees pursuant to its CUTPA claim.  The court has found
that Shaw's has prevailed on its CUTPA claim only as to violations occurring within the
three year period prior to the filing of the counterclaim.

The parties' claims for fees require decision of several mixed questions of fact
and law.  Specifically, the court must determine if the contract's provision for "all loss,
cost, and damage" permits the recovery of attorneys' fees by CCA, and to what extent
CCA may recover fees; to what extent Shaw's may recover fees, given that it has only
prevailed on its CUTPA claim in part; and the amount of fees incurred.  As the parties
have requested, the court will defer further resolution of the issue of attorney's fees
pending post-judgment briefing.

71

### C.   Costs

As with attorney's fees, CCA claims costs on the basis of section 8.1.9 of the Shaw's Lease.  Defendants seek costs pursuant to their counterclaims.  The parties may brief the issue of costs along with the issue of attorney's fees.

## VII.   CONCLUSION

For the foregoing reasons, the court finds in favor of the plaintiffs on Count One. As to the counterclaim, the court finds in favor of the defendants on Count One, Count Four, and Count Five of their counterclaim, and in favor of plaintiff CCA on Counts Two and Three of defendants' counterclaim.

Judgment will enter for the plaintiffs on their claim in the amount of $219,439.00, plus $85,491.03 prejudgment interest, for a total of $304,930.03, and for CCA on Count Two and Count Three of defendants' counterclaim.  Judgment will enter for defendants on Count One in the amount of $405,798.34, Count Four in the amount of $405,798.34 (coextensive with damages on Count One), and Count Five in the amount of $293,121.62 (including compensatory damages of $146,560.81 coextensive with damages on Count One and Count Four, and punitive damages of $146,560.81), together amounting to an award of $552,359.15, plus $166,704.11 prejudgment interest, for a total of $719,063.26.

Any party wishing to make a claim for attorney's fees or costs must submit the claim within three weeks of the date of this Ruling.  Any such claims should state the amount sought and the factual and legal basis for the claim, and should otherwise comply with the Local Rules.  Opposition may be filed within two weeks after the date any such claim is filed.  The court does not intend to extend these deadlines.

**SO ORDERED**.

Dated this 29th day of May, 2009, at Bridgeport, Connecticut.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge